Herbert EVANS, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CF–1036.

District of Columbia Court of Appeals.

Argued Feb. 25, 2010.
Decided Jan. 20, 2011.

Jessica Brand, Public Defender Service, with whom James Klein and Jaclyn Frankfurt, Public Defender Service, were on the brief, for appellant.

Andrew Finkelman, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney at the time the brief was filed, and Roy W. McLeese III, Chrisellen R. Kolb, Frederic Gallun, and Ann K.H. Simon, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and FISHER, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

Appellant Herbert Evans challenges his conviction for aggravated assault while armed (AAWA),[1] arguing that the trial court abused its discretion in declining to grant a mistrial or, in the alternative, in declining to give a curative instruction, to deal with a comment the government made in its opening statement about evidence that was not later adduced at trial. Specifically, appellant argues that the government's mention in its opening of a false

---

1. D.C.Code §§ 22–404.01, –4502 (2001).

exculpatory statement appellant made to police induced the defense to promise the jury in its opening that it would hear a later exculpatory statement also made by the appellant. Then, when the government received an adverse evidentiary ruling, prompting it to abandon the attempt to enter the first statement, the appellant was left with no way to enter the second statement, and therefore, had effectively broken a promise to the jury because of the actions of the prosecution. For the reasons set forth below, we find that the court did not abuse its discretion in declining to grant a mistrial or give the requested instruction.

## I. THE TRIAL

A jury convicted appellant Herbert Evans of aggravated assault while armed (AAWA), following a trial before the Honorable Herbert Dixon of the Superior Court. Evans had been charged by indictment with AAWA, assault with intent to kill while armed (AWIKWA),[2] and carrying a dangerous weapon outside the home or business (CDW).[3] The jury acquitted him of CDW and AWIKWA. He was sentenced to eighty-four months in prison, to be followed by five years of supervised release. This timely appeal followed.

The case arose out of the appellant's stabbing of Steven Boyd several times during a fight on the corner of Olive and Quarles Streets, Northeast, on September 23, 2006. The witnesses for the government at trial included Boyd and Barbara Bowens, a witness to the fight, Boyd's mother Lula Crenshaw, Officer Jason Newman, and Detective John Bevilacqua. Testifying for the defense were James Taylor, who witnessed the fight, and Barbara Bowens' brother Joe Bowens, who was present at the scene but did not witness the fight. The appellant pled self-defense. He chose not to testify in his own defense.

The evidence showed that Boyd approached Evans on the street, upset with Evans for allegedly making sexual advances on a female friend of both. As appellant admits, it was "undisputed that Mr. Evans stabbed Mr. Boyd several times." What was disputed was who started the fight and exactly what happened during it. Boyd's testimony was that after some heated remarks, he began to walk away and Evans stabbed him in the back, continuing to stab Boyd until Boyd told him, "man, I had enough."[4] Barbara Bowens testified that she saw that the men appeared angry, and then "both of them just started fighting." She could not tell who threw the first punch. She testified that at some point, "[Boyd] was actually getting the best of [Evans] and somehow [Evans] overpowered [Boyd] and [Boyd] went down to the ground. That's when [Evans] started stabbing [Boyd]." Mr. Taylor testified that after he heard Boyd and Evans arguing, he saw Boyd throw the first punch. It appeared to Taylor that Boyd "was winning" the fight; Boyd "was getting in more punches, throwing more punches than the other man." Once they were on the ground, he saw Evans stab Boyd in the back with the knife. None of the witnesses testified to seeing Boyd with a knife or other weapon at any time.

---

**2.** D.C.Code §§ 22–401, –4502 (2001).

**3.** D.C.Code § 22–4504(a) (2001).

**4.** Boyd testified that he was addicted to crack cocaine, and had been since 1988. He testified that the day of the attack was the first day he did not use cocaine since 1988, and this was because he had used a lot the night before.

Detective Bevilacqua, the lead detective on the case, testified that he and other officers followed a trail of blood from the scene of the assault back to appellant's apartment. Once there, they knocked on the door, which appellant opened, bandages on a hand and a knee, and clad only in underwear. He also testified at a motion hearing the week before trial, but not at the trial, that when he asked appellant how he had sustained his injuries, appellant said he had been "jumped" on Kenilworth Avenue. At that point, the detective asked appellant if he would come down to the police station to answer some questions about an assault. Appellant agreed and, after dressing, accompanied Bevilacqua to the Sixth District police station. At the station, appellant was asked again how he had sustained his injuries and initially responded again that he had been jumped on Kenilworth Avenue. The officers at the station told appellant that a person had been stabbed at the corner of Olive and Quarles Streets, and that a trail of blood led directly from the scene to appellant's home. They also informed him that they could not exclude the possibility that the assailant had acted in self-defense. At that point, appellant admitted to being involved in the assault and stated that he acted in self-defense.[5]

The appellant's lone assignment of error relates to the manner in which the court dealt with a comment made by the government during its opening statement about a piece of evidence that the government subsequently elected not to present. During his opening statement, after summarizing the evidence of the attack the government intended to introduce, counsel for the government stated, "When the detectives asked [Evans] what happened to you, he said I was jumped by some guys over on Kenilworth Avenue. Well, you will hear that he was not jumped by some guys over on Kenilworth Avenue. You will hear that he injured himself as he was attacking Steven Boyd." Apparently apprehending that the jury might think Evans had fabricated his self-defense claim for trial, counsel for the defense included the following in his opening statement:

Yes, he did tell [the police] at first the story about being jumped on Kenilworth Avenue. Folks, he had just stabbed a man. He didn't know the law of self defense. But, you will hear that as soon as the police told him about what had happened with [Boyd], since the police said look, we got this man here stabbed, Mr. Evans told them what happened. He told them that [Boyd] jumped him. He told them that [Boyd] sliced his hand and he told them that he did stab [Boyd]. He admitted it. He said that I was defending myself.

Significantly, the defense counsel then went on to make numerous detailed remarks, not contained in Evans' statements to the police, about what happened during the fight from Evans' perspective. These statements included that Boyd was "high on Crack cocaine, drunk on alcohol and filled with rage," that Boyd "[came] right after Mr. Evans and he [was] ranting at Mr. Evans," that Boyd "pull[ed] out a knife," and that appellant "put[ ] up his hands to defend himself," that Boyd "slash[ed] [Evans'] hand from knuckle to wrist," that Boyd "hurl[ed Evans] to the ground," causing appellant to "grind [his knee] into the pavement," and that Boyd did "not stop" there; he "[came] right down on top of him swinging, punching[,] pummeling Mr. Evans," until Evans "final-

---

5. At a pre-trial hearing on June 12, 2007, appellant moved, unsuccessfully, for the suppression of his various statements on Fourth and Fifth Amendment grounds. Appellant does not challenge the court's rulings with respect to suppression.

ly [took] that knife and he [swung] it." Defense counsel also made several statements about what Evans was thinking during the fight, such as "[appellant knew] that that man [was] not going to stop," "Mr. Evans [knew] he ha[d] to do something or this man [would] kill him," and "he [was] shocked."

Prior to presenting Detective Bevilacqua's testimony, the government requested a ruling from the court on whether it could enter into evidence Evans' statement at his apartment without opening the door to the admission of the later statement at the police station, which included appellant's claim of self-defense. The defense argued that the rule of completeness should allow the defense to introduce the subsequent statement if the government introduced the earlier statement. After a bench conference, the court agreed with the defense. Following this ruling, the government stated that it would elect not to introduce the earlier statement. The defense moved for a mistrial, arguing that the prosecutor's promise to introduce the first statement had induced it to mention the "complete statement" in its opening, which "is now weighing in the minds of the jury." The court denied the motion.

The defense again moved for a mistrial following the government's case-in-chief. It restated its theory of why the appellant was prejudiced:

> The Government opened on that he just said he got jumped. I think that the Government will still benefit because that will be left lingering in the minds of the jury number one that he gave a false defense to the police. But, also, that we promised something and essentially took on a burden at that point … and we have not fulfilled that.

The government argued that the defense voluntarily assumed the burden of proving the later statement: "Essentially, both parties have now made statements in opening that apparently will not be borne out by the testimony at trial. Both parties gambled. You take the risk." The court once again denied the motion, finding no "misconduct." At the close of evidence, the defense requested a curative instruction "along the lines of … the [m]issing [e]vidence [i]nstruction." The instruction would have informed the jury that the defendant's statement at the police station was evidence "that only the government can introduce" and that the jury could infer from the choice not to introduce it that it "would have been harmful to the [g]overnment." The court denied this request also. The defense did not offer any written request for instruction tailored to the circumstances of the case.

No mention of the initial statement appellant made at his home or the subsequent statement he made at the police station was made during the closing argument of either party.

Before closing arguments, the court gave the standard instructions that the jury "may consider only the evidence properly admitted in this trial," and "the statements and the arguments of the lawyers are not evidence." Directly before the government's closing, the court reiterated that "the statements of counsel are not evidence." These admonitions were actually the second and third such instructions the jury received to this effect: immediately after the jury was impaneled, it was instructed that counsel would have "the option to make opening statements," and that if counsel chose to give them, the jury should keep in mind that "Open[ing] statements are not evidence, but these are merely the statements of the parties, with respect to what they contend the evidence will be."

## II. PROSECUTORIAL MISSTATEMENT

■■■ Appellant makes two arguments in support of his claim of error. First, appellant argues "prosecutorial misstatement," contending that the trial court committed non-harmless error when it failed to grant a mistrial based on the government's representing in opening statement that evidence adverse to the defense would be introduced and then choosing not to offer that evidence. The decision whether to grant a motion for a mistrial is committed to the sound discretion of the trial court. *Anthony v. United States*, 935 A.2d 275, 283 (D.C.2007). Our review is therefore for abuse of discretion. *Najafi v. United States*, 886 A.2d 103, 107 (D.C. 2005). We will reverse a trial court's denial of a mistrial only where it "appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice." *Coleman v. United States*, 779 A.2d 297, 302 (D.C.2001) (internal citations omitted).

■■■ Appellant argues that the prosecutor's statement in this case warranted a mistrial because "[t]he jury was ... made aware of the Kenilworth Avenue story without the prosecutor ever having to put on evidence, subject to cross-examination and other defense challenges, about the statement." When the defense seeks reversal on the basis of a remark made by a prosecutor, a two-pronged inquiry is made. We must first consider whether the challenged remark was improper. *Munn v. United States*, 703 A.2d 1239, 1241 (D.C. 1997). Even if it was, a new trial is required only when the defendant suffered "substantial prejudice" as a result. *Id.* (internal citations omitted). We conclude that appellant's claim fails because he cannot show substantial prejudice from the remark.

■■■ We have stated that "an opening statement consisting of an objective summary of evidence which the prosecution reasonably expected to introduce, although at variance with the evidence actually introduced at trial, need not be cause for reversal." *Augburn v. United States*, 514 A.2d 452, 454 (D.C.1986) (internal citations and quotation marks omitted). "[T]he law does not require that opening trial statements be completely supported by evidence introduced during the trial. Such a rule, rigidly enforced, would effectively eliminate opening remarks and deprive the jury of a very useful outline of the trial." *Owens v. United States*, 497 A.2d 1086, 1091 (D.C.1985) (quoting *Robinson v. United States*, 361 A.2d 199, 200 (D.C. 1976)). "[T]he failure to sustain all opening remarks during the trial is not automatically ground for a new trial. The decision is discretionary and is for the trial judge." *Robinson*, 361 A.2d at 200 (quoting *Mares v. United States*, 409 F.2d 1083, 1085 (10th Cir.1968)).

In *Owens*, the defendants were charged with assault with intent to commit armed robbery. 497 A.2d at 1088–89. The evidence showed the defendants approached the complaining witness in an alley with pistols at their sides and said, "This is it," and, referring to the pistol, "you know what it is." *Id.* at 1089. During the prosecutor's opening statement, he mischaracterized the words as "You know what this is? Give it up"! *Id.* at 1091. He qualified his statement by saying, "words to that effect." *Id.* We determined that there was no reversible error because, following standards established in *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), (1) the remark was made in opening statement and not during the trial, (2) the jury was instructed that opening statements are not evidence, (3) the instruction did not require the jurors to perform "mental gymnastics"—such as would be

required if a jury were asked to consider a confession as evidence against only one codefendant and not against the other, and (4) the remark was not touted to the jury as "critical." *Owens*, 497 A.2d at 1092 (citing *Frazier*, 394 U.S. at 735–36, 89 S.Ct. 1420).[6]

In *Frazier* itself, the Supreme Court considered a misstatement by a prosecutor about testimony a codefendant would provide. 394 U.S. at 733, 89 S.Ct. 1420. The codefendant invoked his privilege against self-incrimination and refused to testify. *Id.* at 734, 89 S.Ct. 1420. Writing for the majority, Justice Marshall observed that the prosecutor's statement "took only a few minutes to recite and was sandwiched between a summary of petitioner's own confession and a description of the circumstantial evidence the State would introduce." *Id.* at 733, 89 S.Ct. 1420. Using the analysis we later quoted in deciding *Owens*, the Court rejected the appellant's claim that the usual instruction that statements from counsel are not evidence was insufficient to guard against any prejudice the statement created. *Id.* at 735, 89 S.Ct. 1420.

■ *Frazier* and *Owens* are controlling here, where the misstatement was confined to opening, it was not touted to the jury as critical, and a general instruction that opening statements are not evidence was given—not once but three times. We may presume that the jury understood and followed the court's instructions. *Ginyard v. United States*, 816 A.2d 21, 30 (D.C. 2003); *Hall v. United States*, 84 U.S.App. D.C. 209, 211, 171 F.2d 347, 349, (1948); *see also Frazier*, 394 U.S. at 736, 89 S.Ct. 1420 ("it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial"). This is particularly true when, as here, "there was nothing to suggest that the jury did not comprehend and respect the admonitions of the trial court." *Ginyard*, 816 A.2d at 30. As in *Frazier*, the erroneous statement here made up a very small portion of the prosecutor's opening remarks, and it was similarly "sandwiched" between more substantive evidence.[7] Further, the statement was not touted as critical: the government did not attempt to relate this statement explicitly to the defense's anticipated theory of self-defense, merely stating it as one of many facts the government anticipated it would produce. Based on an application of the *Frazier* factors, appellant cannot show the prosecutor's statement caused him "substantial prejudice."[8] *See Munn*, 703 A.2d at 1241; *Owens*, 497 A.2d at 1092. Under these circumstances, we perceive no abuse of discretion in the trial court's refusal to grant a mistrial.[9]

6. We noted additionally that a particularized limiting instruction would have been "helpful," but none was requested. *Owens*, 497 A.2d at 1092.

7. The statement came after a lengthy description of the stabbing and before a description of the injuries Boyd suffered as a result of the attack.

8. Any prejudice appellant suffered because the false exculpatory statement would be left "lingering in the minds of the jury" was also mitigated by the fact that the defense presented the later, exculpatory statement in its

opening, which similarly was capable of "lingering" in the jury's mind despite not being reflected by the evidence.

9. Appellant cites a number of cases in which courts have warned against prosecutors' stating facts in opening that are not borne out by the evidence. These cases are distinguishable. Many of them involve erroneous statements made in both opening *and* closing, *see, e.g., Gaither v. United States*, 134 U.S.App. D.C. 154, 171, 413 F.2d 1061, 1078 (1969) (statements in opening and closing about defendant's lack of sales slips or money for the allegedly stolen property in grand larceny

## III. RELIANCE ON THE PROSECUTOR'S OPENING

■ Appellant next argues he reasonably and detrimentally relied on the prosecutor's comments in opening in deciding to include, in his own opening, a summary of appellant's statement at the police station. He contends reversal is warranted under the reasoning we employed in *Wilson v. United States*, 606 A.2d 1017 (D.C.1992) (overruled on different grounds by *Lyons v. United States*, 683 A.2d 1066, 1067 (D.C. 1996)). In *Wilson*, the prosecutor made a pre-trial representation to the court, with defense counsel present, that the defendant had no impeachable convictions. *Id.* at 1019. We held that this representation was an implicit promise not to impeach the defendant if he elected to testify. *Id.* at 1020. The prosecutor then broke this promise mid-trial by announcing his intention to impeach the defendant with his convictions. *Id.* at 1019. Because the promise occurred at a pre-trial stage, it affected defense decisions about whether to go to trial or enter into a plea agreement, whether the defendant should testify if the case went to trial, and what questions to pose to the jury panel during voir dire. *Id.* at 1025. These considerations meant the promise affected the defendant's rights to effective assistance of counsel and to maintain his privilege against self-incrimination.

*Wilson*, however, is distinguishable from the present case. Unlike in *Wilson*, the government's opening statement here was made at a time when appellant had already elected to go to trial instead of entering into a plea agreement, formulated a trial strategy (including arguing self-defense), and decided how to question potential jurors on voir dire. Therefore, the opening statement did not have the same impact on the decisions critical to the formulation of a defense that the pre-trial representation did in *Wilson*. Rather, the prosecutor's opening remarks in the present case affected, at most, the defense decision to mention a particular statement in its opening remarks that was consistent with appellant's self-defense theory. Tellingly, the reasoning in *Wilson* and the cases it relies on has not been applied to opening statements, but instead has thus far been limited to pre-trial representations. *See Smith v. United States*, 491 A.2d 1144 (D.C.1985); *Rosser v. United States*, 381 A.2d 598 (D.C.1977).

Appellant argues this court has characterized representations made during opening statements as "promises," and that the reasoning of *Wilson* can therefore be applied to opening statements. It is true that we have referred to opening statements as "promises." *See, e.g., Arthur v. United States*, 986 A.2d 398, 418 (D.C. 2009); *Dobson v. United States*, 711 A.2d 78, 85 n. 14 (D.C.1998). Analogizing to promises in other contexts, one could conclude that when evidence the prosecutor alludes to in opening fails to materialize during the trial, the prosecutor can be said

case held improper), or simply statements made in closing. *See, e.g., Anthony*, 935 A.2d at 281–82, 284 (trial court erred in denying mistrial when prosecutor repeatedly misrepresented witness's testimony in rebuttal argument, by which time prosecutor "had an obligation to know, and she should have known, that her description . . . was untrue"). Further, in very few of the cases appellant cites was the statement so prejudicial that a mistri-

al was warranted. *See, e.g., Gaither*, 134 U.S.App.D.C. at 173, 413 F.2d at 1080 (error harmless because of caution that closing arguments are not evidence and defendant's contrary presentation of evidence in his own closing); *United States v. DeRosa*, 548 F.2d 464, 471–72 (3d Cir.1977) (mistrial properly denied even when prosecutor gave a "detailed recitation" of wiretap transcripts which were ultimately excluded).

to have "broken" a promise. However, the analogy does not extend as far as appellant would have it. Our cases, as well as cases from other jurisdictions, illustrate that what is meant by the word "promise" in the context of an opening statement is that the party is making a promise to the jury, the breaking of which has the potential to prejudice that party with the jury. *See Arthur*, 986 A.2d at 418 (defendant's decision not to testify prejudiced defendant because it caused him to be unable to fulfill his promise to the jury in opening that he would testify); *Dobson*, 711 A.2d at 83 (in considering appellant's § 23–110 motion, trial court failed to consider prejudice from defense counsel's promise to the jury in opening statement to produce alibi witness and inability to deliver on that promise); *see also Brisbon v. United States*, 957 A.2d 931, 958 (D.C.2008) (counsel permitted to remind the jury in summation that opposing counsel has failed to live up to promises made in opening); *Ginyard*, 816 A.2d at 28 (same); *Allen v. United States*, 106 U.S.App.D.C. 350, 351, 273 F.2d 85, 86 (1959) ("[o]rdinarily, a prosecuting attorney's failure to prove an assertion he made in his opening statement is prejudicial to the Government, not the defendant"); *accord, United States v. Jones*, 592 F.2d 1038, 1044 (9th Cir.1979) ("the Government's inability to produce evidence which it promised the jury would appear to harm the Government's case rather than the defense").

Pre-trial inquiries are "designed to promote the efficient administration of justice" and to give both sides a fair warning of what issues might be raised at trial. *Wilson*, 606 A.2d at 1021, 1022. "[T]he government is obligated to respond accurately and unambiguously to pretrial inquiries made by the court," and "the defense and the court are entitled to rely on" these responses. *Id.* at 1020, 1023;

*see also Smith*, 491 A.2d at 1147 (in order to comply with discovery rules, government responses to pre-trial inquiries regarding statements made by appellant must be accurate and unambiguous). Opening statements serve a different purpose altogether. They are intended simply as a roadmap, to provide "broad outlines of the case to enable the jury to comprehend it." *Brown v. United States*, 934 A.2d 930, 944 (D.C.2007) (quotations omitted); *Owens*, 497 A.2d at 1091. Further, as we have stated, "the law does not require that opening trial statements be completely supported by evidence introduced during the trial." *Owens*, 497 A.2d at 1091; *Robinson*, 361 A.2d at 200. Given the important distinctions between the functions served by pre-trial representations and opening statements, we decline to apply the reasoning in *Wilson* to the present case.

A contrary decision would not be in accord with the flexibility properly afforded attorneys in making decisions regarding opening statements. *See Augburn*, 514 A.2d at 454; *Owens*, 497 A.2d at 1091; *Robinson*, 361 A.2d at 200; *see also Scott v. United States*, 619 A.2d 917, 923 (D.C. 1993) (no prejudice to defendant from counsel's decision not to give opening statement); *Fitzhugh v. United States*, 415 A.2d 548, 551 n. 5 (D.C.1980) (defense may elect to reserve opening statement until after presentation of government case-in-chief); *accord, United States v. Rodriguez–Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985) (timing of opening statement and decision of whether to make one are merely matters of trial tactics). Requiring pinpoint precision in opening statements would not only constitute a novel judicial approach, it would also add significantly to the already great stress facing parties and counsel beginning a criminal trial.

■■■ Appellant argues his reliance was particularly reasonable in this case because our rule-of-completeness case law compelled that if the first statement appellant gave to police was admitted, the second statement would have to be admitted. Appellant also argues that the duty was on the government in the first instance to seek a pre-trial ruling on this issue before opening on it, since the government should have known it would be seeking a generous ruling from the court. We think the question was closer than appellant argues. Under the rule of completeness, "a party is entitled, once a part of a document or recorded statement has been introduced into evidence, to seek admission of the remainder of the statement." *Andrews v. United States*, 922 A.2d 449, 458 (D.C. 2007) (quoting *Henderson v. United States*, 632 A.2d 419, 424 (D.C.1993)). The rule's underlying concern is fairness. *Id.* When a defendant makes one continuous statement, the prosecution may not seek to include only inculpatory portions of it, excluding exculpatory portions, so as to distort the meaning of the statement. *Id.; Henderson*, 632 A.2d at 426.[10]

This court has applied the rule of completeness to "continuous though interrupted" statements. *Johns v. United States*, 434 A.2d 463, 475 n. 19 (D.C.1981) (where government entered inculpatory statement made by defendant at police station, defendant was entitled to present evidence of later, exculpatory statement also given at station). The two statements to police in this case, however, occurred in different locations, under different methods of interrogation, and after different facts and incentives were made known to appellant— all facts that distinguish this case from

*Johns. See id.* The trial court, in its discretion, could have seen these two statements not as parts of one continuous thought, as in the example from Wigmore (*supra* note 10), but rather as two discrete thoughts, not subject to the rule of completeness. *See Henderson*, 632 A.2d at 425 (key inquiry is whether statements together were intended to express one "thought as a whole").

■■■ Having said this, we recognize that *Johns* does lend some support to the rule-of-completeness argument the defense presented at trial, with which the trial court ultimately agreed. Given the closeness of the question, the prosecutor would have been well advised to request a pretrial ruling. However, saying the prosecutor should have sought a pretrial ruling does not mean the defense was "entitled to rely" on the contents of the government's opening statement in promising evidence of its own. As all parties seem to agree, the only evidentiary basis for the defense's presentation of the second statement to the jury would have been the government's presentation of the first statement. Even assuming the defense was correct in anticipating that *if* the first statement were admitted, the second one would also have to be admitted, this does not mean the defense was reasonable in being confident that the first statement *would* ultimately be presented. As is true of government counsel and the trial court, defense counsel also is charged with knowing the law. *Wilson*, 606 A.2d at 1023. Counsel can also be expected to recognize that a prosecutor's opening statement need only be "an objective summary of the evidence which the prosecutor reasonably expected to produce[,]" and that "[m]any things might

---

**10.** One example commonly given is: "if a person is charged with saying, 'There is no God,' he appeals to the preceding clause, 'The fool hath said in his heart.'" *Henderson*, 632

A.2d at 425 (quoting John Henry Wigmore, Evidence in Trials at Common Law § 2113, at 659–60 (James Chadbourn ed. 1978)).

happen during the course of [a] trial which would prevent the presentation of all the evidence described in advance."[11] *Frazier*, 394 U.S. at 736, 89 S.Ct. 1420.

■ Granting a mistrial is a "severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Najafi*, 886 A.2d at 107 (quoting *Salmon v. United States*, 719 A.2d 949, 956 (D.C.1997)). This is so because ordering a mistrial "entails substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial that has already taken place." *Id.* (quoting *Salmon*, 719 A.2d at 956).

■ A missing evidence instruction, appellant's other requested remedy—here an instruction that would have informed the jury that it could infer from the government's choice not to introduce the statement that it would have been harmful to the government—is also not without costs. We have "recognized several dangers inherent in the use of a missing evidence instruction, since it represents a radical departure from the principle that the jury should decide the case by evaluating the evidence before it." *Tyer v. United States*, 912 A.2d 1150, 1164 (D.C.2006) (internal citations and quotation marks omitted). "The adverse inference, which in effect creates evidence from nonevidence, may add a fictitious weight to one side of the case...." *Dent v. United States*, 404 A.2d 165, 170–71 (D.C.1979). "Additionally, the inference is usually argued in summation when an evidentiary explanation for the absence of the [evidence] no longer can be presented to the jury." *Id.* at 171. In recognition of these and other dangers, trial courts have "considerable discretion" in determining whether to give the instruction. *Tyer*, 912 A.2d at 1164. On the facts of this case, we cannot say the court abused its discretion in failing to grant one of these remedies.[12]

■ We are also satisfied that any error here would have been harmless. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[13]

11. Appellant argues that "defense counsel's reliance [that the statement would be offered into evidence] is particularly reasonable given the government's pre-trial behavior" in "vigorously litigat[ing]" against the motion to suppress the statements. However, the suppression hearing occurred six days before the start of trial, and there is no evidence that the government had finalized its litigation strategy by this point. We cannot say that the government's decision to ensure that it had the maximum possible amount of evidence available to it by opposing the suppression motion bound the government to use all of the evidence at trial, any more than its opening statement ensured that nothing would happen during the course of trial that would "prevent the presentation of [this] evidence." *Frazier*, 394 U.S. at 736, 89 S.Ct. 1420.

12. The government argues that a missing evidence instruction is not applicable to a situation where, as here, the evidence was "available" to both parties but one party was precluded from entering it because of a valid hearsay objection. *See Tyer*, 912 A.2d at 1164 (party seeking instruction must show evidence is "peculiarly available to the party against whom the adverse inference is sought to be drawn"); *see also id.* (instruction appropriate to combat government's "negligence or bad faith in the failure to preserve evidence") (internal citation and quotation marks omitted). Because we conclude that a missing evidence instruction was not necessary under the facts of this case, we need not decide whether such an instruction may ever be appropriate in a case such as this.

13. Appellant raised both his prosecutorial misstatement argument and his reliance argument at trial. Therefore, any error would be subject to review under *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239. *See Anthony*, 935 A.2d at 284. The government attempts to relegate

It is significant that, aside from the stationhouse confession, defense counsel made numerous "promises" to the jury in opening that failed to materialize during trial. The jury never heard evidence, for instance, that Boyd was "high on Crack cocaine," that he was "drunk on alcohol," or that he was "filled with rage." The evidence the jury heard instead was that Boyd was "a little upset" with appellant, that he "didn't use any cocaine" that day—although his status as a routine user called the veracity of this statement into question—and that he had had two beers approximately four hours before the fight that he did not believe affected his perceptions. Similarly, the jury never heard evidence that Boyd was the one who "pull[ed] out a knife"; Boyd testified that he never had a knife and no witness testified to seeing Boyd with a weapon at any time. Likewise, the specifics of how the fight transpired and how appellant supposedly defended himself never materialized to anything approaching the degree the defense opening represented it would. Finally, the evidence never showed that appellant attacked only because he "[knew] he ha[d] to do something or this man [would] kill him," nor did it reflect any of appellant's other thoughts, as represented in the defense opening.

The failure of this evidence to materialize can be attributed, at least in large part, to the defendant's decision not to testify. The defendant certainly had an unqualified right to make this decision, whether it ended up reflecting "wisdom or unwisdom." *Boyd v. United States*, 586 A.2d 670, 673 (D.C.1991). In any event, it was not attributable to any action of the government: defense counsel represented to

the court that the only portion of its opening that was affected by the government's opening was the addition of the statement to police at the station. As he said, "everything else about [his] opening, the self defense and Mr. Evans' injuries and the witnesses, it all would have been exactly the same." We agree with the government that, to the extent appellant was prejudiced by "his failure to carry a burden that he voluntarily assumed before the jury in opening statement," the prejudice created by his failure to present the statement made at the police station was far outweighed by the prejudice—undoubtedly self-created—occasioned by his failure to present all of the other details of the attack he promised the jury they would hear. *See Dobson*, 711 A.2d at 83 ("[t]he appearance that the defense has overstated its evidence, and cannot be trusted to keep its promises, may have a significant effect on the jury's evaluation of a case").

We also doubt the severity of the impact of the omission at issue in the context of the trial as a whole. The defense evidence at issue, at the optimum, would have shown that at the station, once informed that the police had evidence that he was the man who had stabbed Boyd, and that a self-defense claim might be available, appellant changed his story to admit the stabbing and argue self-defense. This statement was at best corroborative of his trial theory and at worst showed he fabricated his self-defense claim upon learning he could no longer deny his involvement in the stabbing. It was not, by far, the only evidence on the subject of self-defense that appellant mentioned in his opening statement. *Cf. Dobson*, 711 A.2d at 83 (preju-

some of appellant's finer points to plain error review, arguing that some of the reasoning behind his principal arguments is presented for the first time on appeal. However, "[o]nce a claim is properly presented to the

trial court, a party can make any argument in the appellate court in support of that claim[;] parties are not limited to the precise arguments made below." *Id.* at 282 n. 10 (internal citations and emphasis omitted).

dice to defendant where his counsel failed altogether to provide evidence of defendant's alibi as promised in opening); *Arthur*, 986 A.2d at 418 (plain error where trial judge impermissibly dissuaded defendant from testifying, thereby completely depriving appellant of testimony "crucial to his defense," regarding "his version of the facts" surrounding drug transaction).

Further, the evidence as a whole tended to disprove appellant's self-defense theory. *See Rorie v. United States*, 882 A.2d 763, 771 (D.C.2005) (burden on government to disprove self-defense, once claimed). The evidence showed that appellant stabbed Boyd ten times, including nine deep "penetrating wounds"—as opposed to "slashing wounds"—to his back. No witness testified that Boyd was armed, and Boyd himself gave the most detailed eyewitness account of the attack, which ran directly contrary to appellant's theory. Finally, the jury was instructed not once but three times that it was not to consider statements of counsel as evidence, which is "usually a sufficient cure for any possible prejudice." *Bailey v. United States*, 831 A.2d 973, 981–82 (D.C.2003). Appellant has not shown substantial prejudice so as to warrant reversal of his conviction.

Accordingly, the judgment of the trial court is hereby

*Affirmed.*

RUIZ, Associate Judge, concurring:

I write separately because I do not agree with the majority's framing or analysis of the central issue in the case, one we have not previously addressed, concerning defense counsel's reasonable reliance on representations made by the prosecutor during opening statement. In particular, the question is what consequences and remedies flow when the prosecutor does not follow through on representations on which the defense has relied to its detriment, promising to the jury that the defense will introduce evidence—appellant's statement to the police—corroborating appellant's claim of self-defense. In this case, the trial court should have given a curative instruction to mitigate prejudice to the defense when the prosecutor's trial tactics departed from his initial representation, leaving defense counsel unable to fulfill his promise to present evidence of appellant's statement of self-defense. I concur in the result, however, as I agree that appellant's convictions should be affirmed because any error was harmless.

1. *Appellant's Statements to Police*

As the core of this appeal are two statements appellant made to the police shortly after the stabbing of Steven Boyd for which he was subsequently charged and convicted. The police followed a trail of blood from where the stabbing occurred to appellant's home. In one statement, made at his home, a nervous and bloodied appellant said he had been "jumped" by some men on Kenilworth Avenue. When he was taken (voluntarily) from his home to the police station, appellant first repeated that he had been "jumped," but, when questioned, corrected his statement. He said that an enraged Boyd, who was high on drugs and alcohol, had attacked him with a knife, but that he (appellant) had been able to grab the knife and stabbed Boyd in self-defense.[1] Appellant's claim had some independent corroboration. There was evidence presented at trial that Boyd, who is twenty years younger than appellant (then in his early 50s), was a heavy cocaine user who used cocaine "every day" since 1998. Boyd said he had not used cocaine on the

1. It appears that the intersection of Olive and Quarles Streets, where the stabbing took place, is close to Kenilworth Avenue, where appellant said he had been "jumped."

day of the stabbing, but he tested positive for cocaine when he was taken to the hospital after the stabbing. Boyd also admitted to having had two beers on that day. Boyd testified that he had been angry at appellant, whom he described as "a quiet guy," and had confronted him about a perceived offense (a non-violent sexual proposal) appellant made the previous evening to a woman in whom Boyd apparently had a romantic interest. Boyd told appellant, "God is going to get you." According to Boyd, after he confronted appellant, he turned to leave, and appellant stabbed him in the back. Boyd claimed he never threw any punches at appellant. No one else saw how the fight began. An eyewitness to the fight, Ms. Bowens, saw the two men fighting. She testified that initially Boyd "was actually getting the best of [appellant] and somehow [appellant] overpowered him and [Boyd] went to the ground." Another eyewitness, James Taylor, Ms. Bowen's uncle, also testified that he saw Boyd punch appellant. Boyd suffered twelve knife wounds in all, including nine deep stab wounds to the back; appellant had superficial cuts to his hand and knee.

Because appellant admitted that he had stabbed Boyd, at trial appellant's guilt or innocence turned on whether the jury believed that he had acted in self-defense.

In opening statement, the prosecutor mentioned appellant's first false exculpatory statement to the police (that he had been "jumped" by some men), but said nothing of the second, exculpating statement in which he admitted the stabbing, but said it was in self-defense.[2] Apparently, the prosecutor had formulated a plan—not shared with the court or the defense—to introduce as an admission the first false exculpatory statement appellant made to the police at his house, but to object, on hearsay grounds, to the exculpatory part of appellant's statement to the police, made at the police station. Concerned that the jury would take away from the prosecutor's partial presentation of what appellant had said to the police that appellant's claim of self-defense had been a later, trial-oriented fabrication, defense counsel sought to complete the picture. He told the jury in his opening statement that appellant had indeed initially dissembled but, defense counsel added, "you will hear" that immediately after, at the police station, appellant admitted to stabbing Boyd in self-defense.[3] The presentation of evidence at trial did not develop, however, as counsel had previewed for the jury. When it came time for the government to call the officer through whom it planned to

2. The prosecutor stated in opening:

When the detectives asked him what happened to you, he said I was jumped by some guys over on Kenilworth Avenue. Well, you will hear that he was not jumped by some guys over on Kenilworth Avenue. You will hear that he injured himself as he was attacking Steven Boyd.

3. Defense counsel's opening statement responded to the prosecutor's opening:

Ladies and gentlemen, you will see that Mr. Evans cooperated with the police. Yes, he did tell them at first the story about being jumped on Kenilworth Avenue. Folks, he had just stabbed a man. He didn't know the law of self defense. But, you will hear that as soon as the police told him

about what had happened with [Boyd], since the police said look, we got this man here stabbed, Mr. Evans told them what happened.

He told them that [Boyd] jumped him. He told them that [Boyd] sliced his hand and he told them that he did stab [Boyd]. He admitted it. He said that I was defending myself.

Ladies and gentlemen, when you hear what Mr. Evans told the police, you will see that unlike what [Boyd] says, what Mr. Evans said is corroborated by the people who were out there. It's corroborated by the physical and medical evidence. It makes sense.

introduce the first part of appellant's statement to the police, the prosecutor asked for a ruling on whether introduction of appellant's false exculpatory statement would "open the door" to admission of appellant's second statement, that he stabbed Boyd in self-defense. Citing the rule of completeness, the trial judge ruled that if the government introduced the first part of the statement, it could not object to the defense's introduction of the rest of the statement. The prosecutor then changed course, and decided not to introduce the part of appellant's statement to the police that he had mentioned to the jury in opening statement. This left the defense without the mechanism the prosecutor's opening statement had provided to present to the jury the timely claim of self-defense promised to the jury during the defense's opening statement. Defense counsel argued that appellant would be prejudiced if counsel failed to follow up on his promise to the jury. He filed three motions for a mistrial; in the alternative, counsel asked for a curative instruction. The trial judge denied the mistrial motions and did not give any curative instruction. Instead, the judge relied on the general instruction that "statements of counsel are not evidence."

### 2. The Prosecutor's Opening Statement Was Improper

This case raises the question whether the prosecutor improperly mentioned in opening that appellant had made an inculpatory statement to the police, without first seeking a ruling from the trial judge on the legal viability of the prosecutor's planned strategy to introduce only the inculpatory part of appellant's statement, without introducing the exculpatory part of the statement.[4] Here, the prosecutor had good reason to doubt that his strategy would succeed. As the government's brief acknowledges, we have not ruled on application of the rule of completeness to the situation presented here, and, as the majority notes, our opinion in *Johns v. United States*, 434 A.2d 463 (D.C.1981), casts doubt on the prosecutor's operative assumption. See *ante* at 11.[5] Under the circumstances, the prosecutor should have presented his planned strategy to the trial judge for a ruling in advance so as to avoid mentioning evidence in opening statement that would not be introduced at trial, as happened here. "It is improper for counsel to . . . refer in an opening statement to evidence without a good faith basis for believing that such evidence will be introduced." *Najafi v. United States*, 886 A.2d 103, 108 (D.C.2005) (citing *Frederick v. United States*, 741 A.2d 427, 440 n. 25 (D.C.1999) (citing ABA STANDARDS FOR CRIMINAL JUSTICE 7.4 (The Defense Function) (1993))). That the comment was made in opening statement does not exclude it from "the obligation of the prosecutor to avoid making statements of fact to

4. I find it disappointing, to say the least, that the prosecutor's trial strategy was to use as an admission the inculpatory part of appellant's statement to the police while seeking to object to, and keep from the jury, the exculpatory portion of appellant's statement. In a criminal trial the government should endeavor to present evidence that will enable the jury to ascertain the truth of the guilt or innocence of the accused.

5. The fairness of the judge's ruling is self-evident, and the prosecutor's assumption that it would be otherwise was legally unfounded. Although the majority calls the evidentiary question "close," it does not take serious issue with the correctness of the trial court's ruling. See *ante* at 11. Therefore, as counsel should be "charged with knowing the law," *id.* at 11, it is not defense counsel, but the prosecutor, who should be taken to task. As the prosecutor candidly said, however, the decision to mention appellant's statement in opening was a "gamble" and not, apparently, a decision based on a firm assessment of the law.

the jury not supported by proper evidence introduced during trial." *Gaither v. United States*, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969). Opening statements must be careful to hew to the evidence to be presented at trial because "[f]irst impressions are not easy to dispel." *Najafi*, 886 A.2d at 108. Thus, we have said, there is "no doubt regarding where the obligation to be fair and accurate lies." *Anthony v. United States*, 935 A.2d 275, 284 (D.C.2007). "It is incumbent upon the prosecutor 'to take care *to ensure* that statements made in opening and closing arguments are supported by evidence introduced at trial.'" *Id.* (quoting *United States v. Small*, 316 U.S.App.D.C. 15, 19, 74 F.3d 1276, 1280 (1996)). In light of this well-established obligation, I take exception to the prosecutor's comment to the trial court, quoted by the majority, that counsel had "gambled" in their opening statements and that "you take the risk." See *ante* at 6. The prosecutor should have sought a ruling from the judge, not taken a "gamble." We have rejected that sporting theory of justice; a criminal trial is not a crap shoot.

Even though the prosecutor's opening was improper, *see United States v. Novak*, 918 F.2d 107, 109 (10th Cir.1990) (noting that the opportunity to present an "objective summary" in opening statement "does not allow the prosecution to refer to evidence of questionable admissibility"), I do not believe that the prosecutor should have been forced to follow through on the promise to introduce the evidence he previewed in opening statement. When the court's ruling proved that the prosecutor's strategy was legally wanting, the choice whether to introduce appellant's statement as part of the government's case, as he had said he would during opening (including weighing the consequences to the government's case of failing to follow through with the jury), was for the prosecution to make.

3. *Defense Counsel Reasonably Relied on the Prosecutor's Opening Statement*

The question for the trial court—and for this court on appeal—is what measures should have been taken to mitigate the prejudice to the defense resulting from the prosecutor's opening and later change in strategy as the trial progressed. Relying on the prosecutor's opening statement, defense counsel announced to the jury that the defense would present evidence that corroborated appellant's claim of self-defense. This was a promise that the defense would have fulfilled, but was prevented from fulfilling, by the prosecutor's mid-trial change of course after the trial judge's evidentiary ruling. The majority concludes, in essence, that because the prosecutor cannot be held to its promise to the jury, the defense has no remedy for its good faith, detrimental reliance on the prosecutor's in-court representation.

An unfortunate consequence of the majority's analysis is that it condones the prosecutor's failure to obtain the judge's ruling before making an assertion in opening statement that was legally questionable; it also implies that defense counsel should mistrust, and be on guard against, representations made in open court by the prosecutor. As the United States Court of Appeals for the District of Columbia Circuit has emphasized, however, "the federal courts generally, and this court in particular, have strictly enforced," *Gaither*, 134 U.S.App.D.C. at 172, 413 F.2d at 1079, the prosecutor's obligation to "take care to ensure that statements made in opening and closing arguments to the jury are supported by evidence introduced at trial." *United States v. Small*, 316 U.S.App.D.C. 15, 19, 74 F.3d 1276, 1280 (1996); *see Anthony*, 935 A.2d at 284 (citing *Small*). Lowering the standards expected of prosecutors also undermines the civility and effi-

ciency of court proceedings that this court and the Bar have so assiduously tried to promote. We have emphasized the importance of the reliance that counsel can place on each other's representations in civil trials. *See Miranda v. Contreras*, 754 A.2d 277, 281 (D.C.2000) ("As colleagues at bar and officers of the court, and to ensure the efficient, accurate and just operation of judicial proceedings, counsel must be able reasonably to rely on representations made by fellow counsel in the context of litigation. Conversely, counsel should not be able to reap the windfall of his or her misrepresentation to fellow counsel."). No less should be required in the context of a criminal proceeding, where the public's interest in seeing that justice is done and the court's role in assuring a fair proceeding are paramount.

As the majority recognizes, we have held prosecutors to the consequences of their representations concerning trial strategy when, for example, the prosecutor misinformed defense counsel that the defendant had no impeachable convictions; when the defendant took the stand at trial, the prosecutor was not permitted to impeach him with prior convictions. *Wilson v. United States*, 606 A.2d 1017, 1020 (D.C. 1992), *overruled on other grounds by Lyons v. United States*, 683 A.2d 1066, 1067 (D.C.1996).

The majority distinguishes this principle of reliance on the ground that the cases we have decided involved representations made pre-trial, "designed to promote the efficient administration of justice," and that, because the "government is obligated to respond accurately and unambiguously to pretrial inquiries made by the court,"

the defense is "entitled to rely on" the prosecutor's responses. See *ante* at 10, quoting *Wilson*, 606 A.2d at 1020, 1021, 1023. The critical factor, however, is not whether a representation is made before trial or during trial, but whether opposing counsel was entitled to rely on the representation in preparing and presenting the defense case.[6] The majority does not explain why defense counsel should not be as entitled to rely on representations made by the prosecutor in open court during trial as on those made pre-trial. *See Rosser v. United States*, 381 A.2d 598, 609 (D.C.1977) (noting in the context of incomplete discovery that "our decision here turns on the government's incorrect representation ... in open court ... coupled with the prosecution's implied delivery of [witness's] complete grand jury testimony ..."). It is true that representations made by a prosecutor pretrial can lead the defense to forgo certain strategies and defenses. It is at least equally true, however, that the defense can be seriously prejudiced by representations made during trial. Once trial strategy is formulated and the case has been previewed in opening and is being presented to the jury, the defense has less room to maneuver. Therefore, any disruption caused by the defense's detrimental reliance on the prosecutor's representations at trial, when the defense has fewer options, has the potential for serious prejudice. In this case, defense counsel responded to the misimpression created by the prosecutor's opening by telling the jurors in the defense opening statement that they "would hear" appellant's statement to the police that he

---

6. The majority's statement that "the reasoning in *Wilson* [and *Smith* and *Rosser*] has not been applied to opening statements, but instead has thus far been limited to pretrial representations," see *ante* at 9, overstates the point. In none of these cases has the issue of

a representation made during the prosecutor's opening statement been considered by the court. This appeal appears to be the first time the issue of the defense's reliance on a prosecutor's opening has been presented to us.

had stabbed Boyd in self-defense. Defense counsel's response was based entirely on the representation made by the prosecutor in his opening statement that the other (inculpatory) part of appellant's statement would be introduced during trial. Defense counsel's action was reasonably based on the exigencies of the rule of completeness, as explained in the trial judge's ruling. Defense counsel offered to show the trial judge the opening statement he had drafted before he heard the prosecutor's representation to prove that, otherwise, the defense opening would not have promised the jury that the exculpatory statement also would be introduced.[7] It is the inability to fulfill that promise, which remained unfulfilled not because of defense counsel's doing but as a direct result of the prosecutor's initial carelessness and change in strategy, that appellant claims unfairly prejudiced his claim of self-defense before the jury.

It is important to note that this case is not like *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), or *Owens v. United States*, 497 A.2d 1086 (D.C. 1985), on which the majority relies. *Frazier* recognized that "[m]any things might happen during the course of the trial which would *prevent* the presentation of all the evidence described in advance" during opening statement. 394 U.S. at 736, 89 S.Ct. 1420 (emphasis added). Here, unlike in *Frazier* where the witness the government "reasonably," *id.*, expected to call invoked the Fifth Amendment and refused to testify, nothing *prevented* the government from introducing the part of appellant's statement to the police that it had

said it would introduce during opening statement. The trial judge's ruling in this case did not prevent the prosecutor from introducing the statement; rather, the trial judge's ruling made clear that the rule of completeness would not permit the prosecutor's plan to present only the inculpatory part of appellant's statement and that fairness required that the jury be apprised of the exculpatory part of appellant's statement as well. This ruling was not what the prosecutor had hoped for and not to his liking, so the prosecutor changed his mind and chose not to introduce appellant's statement. Because the defense could not introduce the statement itself over the prosecutor's hearsay objection, it could not fulfill its promise to the jury that it "would hear" that appellant had early on asserted to the police that he had stabbed Boyd in self-defense. That is a critical distinction between this case and *Frazier* and *Owens*. In those cases, the issue was whether the government had been unfairly advantaged by the prosecutor's reasonable mention in opening statement of facts helpful to its case that were not supported by evidence introduced at trial. *Frazier*, 394 U.S. at 734, 89 S.Ct. 1420; *Owens*, 497 A.2d at 1091; *cf. Najafi*, 886 A.2d at 104 (prosecutor repeatedly implied during opening, without any evidentiary support, that defendant was "running a business" of selling drugs). That was a concern here as well; but neither *Frazier* nor *Owens* involved the additional prejudice resulting from the defense's reliance on the prosecutor's opening statement to make its own evidentiary promise to the jury.

---

7. Defense counsel told the court:
   [T]he government opened on the fact that Mr. Evans spoke to the police. In response to that, I opened on what Mr. Evans later told the police in that continuous statement. I can tell the court and *I can show the court my draft of my opening, that had the govern-* *ment not opened on the statement, I would not have opened on the statement.*
   (Emphasis added). The trial judge did not take up defense counsel's offer to review the opening statement he had drafted before the prosecutor's opening.

#### 4. Remedies in Mitigation

Having concluded that defense counsel relied, and reasonably so, on the prosecutor's opening statement, the question is what remedies should have been employed to mitigate the inevitable prejudice that resulted from the prosecutor's change of course following the trial judge's ruling. Defense counsel moved for mistrial three times. The first was during the government's case, as soon as it became clear that the government would not be introducing appellant's statement to the police. In this regard, this case is not like *Salmon v. United States,* quoted by the majority, see *ante* at 12, where the entire case had been presented and the jury had already retired to deliberate. 719 A.2d 949, 956 (D.C.1997). A mistrial always will incur some cost to the system. Nonetheless, mistrial must be granted, and those costs borne, when "the danger of prejudice has undermined the reliability of the proceedings to such a measure that the drastic remedy of mistrial is necessary." *Anthony,* 935 A.2d at 287.[8]

There was a much less-drastic remedy available here. Defense counsel requested a curative instruction that "tells the jury that only the Government can introduce the defendant's statement. And if they have any questions about that, that they may infer that that evidence would have been harmful to the Government along the lines of ... the missing evidence instruction." To the trial court's first reaction, "I hear very few new things nowadays. But this is the first time that I have ever heard this argument," defense counsel responded that "this is a rare situation, Your Honor." The prosecutor objected to the curative instruction, focusing exclusively on the terms of the traditional missing evidence instruction (No. 2.41 in the Redbook). The trial judge denied the request for a curative instruction because "the missing evidence instruction does not apply to the statements of the defendant in the possession of the Government that are exculpatory in nature"; and, even if it did, the instruction was inapplicable because "the evidence with respect to the [defendant's] statement was [not] peculiarly within the possession of the government."

As is clear from the explanation of its ruling denying the requested instruction, the trial court misapprehended defense counsel's request. The two elements that defense counsel requested in an instruction were: (1) that only the government could *introduce* appellant's statement to the police, not that only the government possessed the evidence, and (2) that "along the lines of" a missing evidence instruction, the jury could consider that if the government had decided not to introduce relevant evidence that it solely had the means to introduce (as the defense did not), it *may* infer that the government thought it would be harmful to its case. Both elements of what defense counsel requested were true in this case. Because the government could present appellant's out-of-court statement to the police, as an admission, and the government had said it would object, on hearsay grounds, if the defendant tried to introduce the out-of-court statement, only the prosecutor could introduce appellant's statement to the police. Moreover, by his mid-trial change of course when the trial court determined that the rule of completeness required that the exculpatory portion of appellant's statement would have to be presented along with the inculpatory part that the prosecutor had hope to present alone, the

---

8. Because I conclude that any error was harmless, I do not think that the trial court abused discretion in denying a mistrial.

prosecutor demonstrated that the inference the instruction would have permitted (not compelled) the jury to make was eminently reasonable. The trial judge, however, seized upon the "missing evidence" analogy and erroneously ruled that no curative instruction should be given because a missing evidence instruction "did not apply to the defendant's exculpatory statement" and was not "peculiarly within the possession" of the government. Here, although both parties had the evidence, only the government had the means to introduce it to the jury.[9] In a very real sense, therefore, it was peculiarly within the control of the government.

The trial court also should have taken into account that the instruction was not being requested in a vacuum, but in order to mitigate the prejudice to the defense from its inability to fulfill its promise to the jury that had been frustrated by the prosecutor's change of trial strategy. In discussing the requested instruction, the majority speaks generally about the "costs" and "dangers" of the missing evidence instruction, which permits the jury to "create[ ] evidence from nonevidence," *Dent v. United States*, 404 A.2d 165, 170–71 (D.C.1979), and represents "a radical departure from the principle that the jury should decide the case by evaluating the evidence before it." *Tyer v. United States*, 912 A.2d 1150, 1164 (D.C.2006). See *ante*

at 12. None of these dangers was present here, however, where the substance of the evidence was *known*—there was a video of appellant's statements at the police station—and was available for the court's review to determine whether it would be "likely to elucidate the [matter] at issue" and, thus, whether an inference against the government if it withheld the evidence from the jury would be reasonable and fair. *Tyer*, 912 A.2d at 1164 (quoting *Hinnant v. United States*, 520 A.2d 292, 294 (D.C.1987)).

Moreover, defense counsel's request for a curative instruction "along the lines of" a missing evidence instruction signaled that he was not seeking a traditional missing evidence instruction per se, but one tailored to the "rare" situation that had presented itself in the case. In his motions for mistrial, defense counsel repeatedly made clear to the judge that what concerned him was that the defense had been rendered unable to introduce the statement made by appellant to the police, as counsel had promised at the outset of the trial based on the prosecutor's prior representation.[10] The defense's inability to fulfill its promise, counsel was arguing, should not be held against the defense, but against the government which had thwarted the defense's opening promise. Defense counsel's request described precisely

---

9. As the trial judge mentioned, the prosecutor had several means to present the evidence "if the government had chose[n]" to do so: the police officer could testify as to what appellant said, the government could have presented "the video of the statement itself," or "just the audio of the statement." The trial judge recognized that "there is no requirement on the defendant to present evidence," but offered that "the capability to talk about what happened during the interview does rest with the defendant if the defendant himself decided to testify." The defense could not introduce the substance of appellant's out of court statements, however. Moreover, the defendant

cannot be forced to testify, nor can his exercise of the right not to take the stand be impugned before the jury.

10. As defense counsel explained to the court, "I want to make sure that my argument is clear. I would have still opened on self-defense.... But, I would not have opened on what Mr. Evans told the police at the station about what happened.... Now ... we are left in a position that the jury will be expecting to hear [appellant's statement to the police that he stabbed Boyd in self-defense] and expecting some explanation from the defense."

what had happened in this trial and the court should have taken steps to present defense counsel's conundrum to the jury so as to mitigate any negative inference that the jury might unfairly draw against appellant's claim of self-defense. In this situation, the generic instruction that arguments of counsel are "not evidence" did not begin to address the prejudice that concerned the defense. *Cf. Anthony,* 935 A.2d at 284 ("We have not regarded the standard judicial caution that the jury's recollection controls as a cure-all ...." (quoting *Gaither,* 134 U.S.App.D.C. at 172, 413 F.2d at 1079)). An instruction tailored to the circumstances was called for, but the trial court's ruling about the inapplicability of the missing evidence instruction cut off any further discussion to formulate an appropriate instruction.

### 5. *Harmless Error Analysis*

Although the trial judge erred in not giving such an instruction, I conclude that the error was harmless. To the extent that the prosecutor's opening statement about appellant's initial dissembling when he talked to the police lingered with the jury, so would defense counsel's opening referring to appellant's explanation to the police that he stabbed Boyd in self-defense. Appellant argues that a lay jury, not understanding that the defense could not introduce out-of-court statements made by appellant, would have expected appellant to take the stand, and would have held it against him if he did not. Any such expectation should have been mitigated by the court's instructions that the defense had no responsibility to present evidence, that no negative inference could be drawn from appellant's decision not to testify, and that it was the government's burden to present evidence to rebut appellant's claim of self-defense. Most important, in light of the evidence presented, it is unlikely that the jury was swayed

to convict appellant because of defense counsel's failure to fulfill the promise made in opening statement that appellant told the police that he stabbed Boyd in self-defense when he was questioned at the police station. It must be recognized, that the evidence supporting the government's case that appellant initiated the fight was fairly sketchy, and that there was evidence supporting appellant's claim that it was Boyd who confronted him and started the fight. In particular, Boyd, a longtime user of cocaine, was angry at appellant, and Ms. Bowens and Mr. Taylor testified that Boyd was not passive and even "was actually getting the best of [appellant]" until appellant "overpowered him and [Boyd] went to the ground." If that were the extent of the evidence, appellant would be entitled to a new trial. However, the Medical Examiner's testimony that Boyd suffered nine deep "penetrating wounds" in the back was compelling evidence that even if appellant began to fight Boyd in self-defense, he used more force—deadly force—than was reasonably necessary to protect himself. Although appellant was acquitted of carrying a dangerous weapon (the knife), he admitted that he stabbed Boyd; no one saw Boyd with a knife. Appellant suffered fairly minor cuts to his hand and knee. Appellant's claim of self-defense was most likely rejected by the jury, in other words, not because the jury believed that he had lately fabricated the story that Boyd had attacked him and that he had acted in self-defense (defense counsel's reason for wanting to introduce his early statement to the police claiming that he stabbed Boyd in self-defense), but because the properly instructed jury determined that appellant had forfeited his claim of self-defense by using force in excess of what was reasonable to repel Boyd's attack. *See Edwards v. United States,* 721

A.2d 938, 941–42 (D.C.1998).[11] On this record, I can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 756, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). It is on this basis that I concur in the court's disposition affirming appellant's convictions.

---

**11.** In closing argument, the prosecutor emphasized the location and depth of the stab wounds in Boyd's back to argue that it was unlikely that appellant had been defending himself from Boyd's attack and, even if he was, that he had unreasonably used deadly force. The defense closing justified the numerous stabbings by focusing on how threatening the attack by the younger and drug-influenced Boyd would have appeared to appellant.