*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 11-CF-1670, 11-CF-1671 and 12-CF-7

JAMARR MEDLEY
ANTOINE RICHARDSON and
LUCIOUS MCLEOD, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-25785-09, CF3-4288-10 and CF3-2027-11)

(Hon. Ann O'Regan Keary, Trial Judge)

(Argued September 16, 2014     Decided December 18, 2014)

*Mikel-Meredith Weidman*, Public Defender Service, with whom *James Klein, Jaclyn Frankfurt* and *Shilpa Satoskar*, Public Defender Service, were on the brief, for appellant Medley.

Antoine F. Richardson, *pro se.*

*Cory L. Carlyle* for appellant McLeod.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Ronald C. Machen, Jr.*, United States Attorney, and *Elizabeth Trosman, John P. Mannarino* and *David Gorman*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*, and REID, *Senior Judge*.

THOMPSON, *Associate Judge*: Following a joint jury trial, appellants Antoine Richardson and Jamarr Medley were found guilty of assault with a dangerous weapon (ADW), aggravated assault while armed (AAWA), and assault with significant bodily injury (ASBI), and appellant Lucious McLeod was found guilty of assault with intent to kill while armed (AWIKWA), AAWA, ASBI, and obstruction of justice. Appellants raised several claims on appeal. Richardson argues that the trials were misjoined under Super. Ct. Crim. R. 8 (b). Each appellant argues that his trial should have been severed from the trial of the other appellants. Medley and McLeod contend that statements made by appellant Richardson during recorded jail calls should not have been admitted without (further) redaction and also argue that some of their convictions merge. Richardson and Medley argue that the victim did not suffer "serious bodily injury" for purposes of the AAWA statute, and therefore that their AAWA convictions should be reversed. In addition, Richardson assigns as error the trial court's (1) admission of evidence that he previously assaulted another individual; (2) failure to instruct the jury that Richardson's initial encounter with the victim was not part of the charged conduct; and (3) refusal to provide a missing evidence instruction to the jury. Richardson also raises an issue with respect to the Bureau of Prison's payment schedule for the fines imposed as part of his sentence. For the reasons

that follow, we affirm but remand for the trial court to vacate the convictions that merge with appellants' AAWA convictions.

## I.  Background

Appellants' convictions arose out of two assault incidents, involving the same victim but transpiring a year apart from each other.  Only Medley and Richardson were charged with the first assault; only McLeod was charged with the second assault.  The jury heard the following evidence.

### A.  The November 10, 2009, Assault (Richardson and Medley)

Cordell Brown testified that on November 10, 2009, he was walking on B Street, S.E., near its intersection with Bass Place, when appellant Richardson approached him.  According to Brown, Richardson asked him why he had provided cocaine to Jeanetta Smith, a young woman with whom Richardson was romantically involved.  Although Brown denied having given cocaine to Smith, Richardson responded by hitting Brown on the head with a pole.

Brown testified that he walked around a corner to escape Richardson, but saw Richardson come around the corner, following him. When Brown approached Richardson and said, "Man, you hit me," Richardson again used the pole to hit him. Brown and Richardson began grappling, with Brown pinning Richardson's arms, pushing him against a wall, and head-butting him. Brown then felt something hit his back. He turned and saw appellant Medley (and no one else) directly behind him. Moments later, Brown felt something stab him in his side.

Cheryl Jones, Brown's girlfriend at the time, testified that she was in a first floor apartment on Bass Place on November 10, 2009, when she heard Brown, from outside, saying that a man had hit him for no reason. Jones came outside and saw that Brown had a bleeding knot on his head. Brown told her that Richardson had just hit him, and, a moment later, Jones saw Richardson come around the corner. Brown then approached Richardson, and the two began fighting. Jones saw Richardson hit Brown with a "black gate" and saw Medley hit Brown with a chair. Richardson and Medley fled soon after.

**B.  Richardson's calls from jail**

Richardson was arrested on December 6, 2009, but Medley was not arrested until May 7, 2010. While in jail, Richardson made a series of phone calls that were recorded and which the government introduced at trial, with some redactions. In one call, Richardson said that he needed McLeod to "get on top of" the situation and to "talk to people." A few seconds later, Richardson added that Medley "need[ed] to do something" as well. In still another call, Richardson asked the other speaker to find McLeod and tell him, "[Richardson] says he needs you on this."

## C. Medley's and McLeod's repeated approaches to Brown and Jones

The jury heard from Jones, who confirmed her grand jury testimony, that, shortly after the 2009 assault, Medley approached her twice, once in a laundromat to ask her for Brown's location, and once to ask her to "make peace" and have Brown drop the charges. Brown testified that, on one occasion after the November 2009 assault, he was at the Benco Shopping Center, a few blocks from the scene of the assault, when he saw McLeod and Medley coming towards him.[1] At seeing Medley, Brown fled to the nearby Metro station. Jones testified similarly about the

---

[1] During cross-examination, Brown clarified that McLeod and Medley were not approaching together.

event, adding that Medley specifically asked to speak with Brown during this incident.

On another occasion after the November 2009 assault, McLeod approached Brown and repeatedly said, "I know you ain't going to court[.]" Brown responded by expressing his intention to testify against his assailants. On a third occasion, McLeod offered Brown money to not go to court.

**D.  The November 1, 2010, Assault (McLeod)**

On November 1, 2010, four weeks before the scheduled trial date for the 2009 assault, Brown was attacked again. According to Brown's testimony, he was walking alone on Texas Avenue, heard someone call his name, turned around, and saw appellant McLeod, whom he had known for several years as a friend of Richardson's, immediately behind him. McLeod stabbed Brown in his left breast and said, as Brown slumped to the ground, "I knew I would catch you by yourself." Brown testified that McLeod struck him several times before he was able to escape down Texas Avenue. He remembered stopping to throw up blood, and the next thing he knew, he was in an ambulance.

## II.    Analysis

### A.  Joinder

Richardson challenges the trial court's decision to join appellants' trials under Super. Ct. Crim. R. 8 (b), a decision the court based on its finding that the two assaults were part of the "same series of acts or transactions[.]" [2] Super. Ct. Crim. R. 8 (b).  Our case law establishes that separate offenses can constitute a joinable "series of acts or transactions" where "one offense logically leads to another[.]" *Settles v. United States*, 522 A.2d 348, 352 (D.C. 1987) (quoting *Davis v. United States*, 367 A.2d 1254, 1262 (D.C. 1976).  An offense leads logically to another when one crime is a "sequel" to the other.  *Bush v. United States*, 516 A.2d 186, 192 (D.C. 1986).  "Sequel" offenses include, *inter alia*, attempts to obstruct justice, which make appropriate the joint trial of an underlying offense and

---

[2] A trial court's decision to jointly try defendants presents a question of law and is subject to *de novo* review.  *Ball v. United States*, 26 A.3d 764, 767 (D.C. 2011) (citing *Ray v. United States*, 472 A.2d 854, 857 (D.C. 1984)).  "There is, traditionally, a presumption in favor of joinder . . . because joint trials 'do conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'"  *Carpenter v. United States,* 430 A.2d 496, 502 (D.C. 1981) (en banc) (citation omitted).

additional offenses committed by others in an attempt to hide the underlying offense. *See id.*[3]

Here, trials for the 2009 and 2010 assaults were properly joined because "joinder of defendants is proper under Rule 8 (b) 'if they are *alleged* to have participated in the . . . same series of acts or transactions[.]'" *Jackson*, 329 A.2d at 787 (emphasis in original). The 2010 assault was motivated, according to the government's theory of the case, by McLeod's desire to prevent Brown from testifying against Richardson as to the 2009 assault, and the government so alleged in the indictment. Further, the government introduced evidence at trial to corroborate its theory, including evidence that Richardson and McLeod were friends, that Richardson asserted in telephone calls made from jail that he needed McLeod to "get on top of" the situation, and that McLeod repeatedly attempted to talk Brown out of testifying before he resorted to violence. Thus, "while [the government's theory] rest[ed] upon inference, the evidence show[ed] a sufficient

---

[3] *See also, e.g.*, *Sams v. United States*, 721 A.2d 945, 953-54 (D.C. 1998) (affirming joinder of assault charge with obstruction of justice charge when one of the assailants threatened a material witness); *Taylor v. United States*, 603 A.2d 451, 455-56 (D.C. 1992) (affirming joinder of defendants charged with assault and perjury, respectively, as the perjury was an attempted cover-up of the other offense); *Jackson v. United States*, 329 A.2d 782, 787 (D.C. 1974) (affirming joinder of two defendants when one was charged with murder and the other with intimidating a witness).

nexus between [Richardson and McLeod] to support the inclusion in the indictment of a charge" that McLeod endeavored forcibly to obstruct justice by assaulting Brown. *Id.*

### B. Severance

Even in cases where joinder under Rule 8 (b) is appropriate, severance may still be necessary under Rule 14, which protects parties from "manifest prejudice as a result of being tried jointly." *Harrison v. United States*, 76 A.3d 826, 834 (D.C. 2013) (quoting *Hargraves v. United States*, 62 A.3d 107, 115-16 (D.C. 2013) (internal quotation marks omitted); Super. Ct. Crim. R. 14. A party seeking reversal based on the trial court's refusal to sever properly joined offenses must show the "most compelling prejudice." *Winestock v. United States*, 429 A.2d 519, 527 (D.C. 1981) (quoting *United States v. Rhodes*, 569 F.2d 384, 390 (5th Cir. 1978)). "[S]ome amount of prejudice will be permitted in favor of judicial economy and the concomitant expedition of cases." *Carpenter*, 430 A.2d at 502. The decision to sever properly joined offenses is committed to the discretion of the trial court and will be reversed only when the appellant makes a "clear showing that [the trial court] has abused its considerable discretion." *Sterling v. United States*, 691 A.2d 126, 135 (D.C. 1997).

1. *Medley's arguments*

Medley argues that he suffered compelling prejudice from joinder because it enabled the prosecutors, in their opening statement and closing argument, to portray the two assaults as if they were part of "a protracted joint campaign" or "uncharged conspiracy to obstruct justice," and as if the 2010 stabbing that left Brown "on the brink of death" — evidence of which "would not have been admissible if Medley had been tried separately on . . . the 2009 assault" — was "the product of coordination and cooperation among" the three defendants. Medley contends that joinder "created an impression that [he] participated in his codefendants' efforts to obstruct justice" and thus "significantly increased the likelihood that the jury would find him guilty of the 2009 assault." He argues that the joinder, which permitted the jury to hear evidence that suggested his connection with a plan to silence Brown, made it "more plausible that [he] was participating in a violent assault at the behest of Richardson, rather than defending his friend after he saw him pinned against a wall."

Medley's arguments do not persuade us that he suffered manifest prejudice from joinder. It is settled that "[t]he fact that 'a defendant would have had a better

chance of acquittal had he been tried alone' is not, in and of itself, a basis for holding that the denial of severance constitutes an abuse of discretion." *Sousa v. United States*, 400 A.2d 1036, 1042 (D.C. 1979). We have found manifest prejudice, such as would require severance under Rule 14, where one defendant is associated with a significantly more heinous crime committed solely by co-defendants,[4] where the evidence against one defendant is *de minimis* compared to the evidence against another,[5] where one defendant makes an inculpatory statement that cannot be admitted against a co-defendant,[6] where refusal to sever prevents a defendant from testifying on a co-defendant's behalf,[7] or where defendants present conflicting defenses such that there is "a danger or risk 'that the jury will conclude guilt from the conflict alone[.]'"[8] None of these circumstances was present in this case. The 2009 and 2010 assaults were similarly heinous, both resulting in

---

[4] *Sousa*, 400 A.2d at 1041-42 (holding severance required when assault and weapon possession charges against one defendant where joined with murder charges against other defendants).

[5] *Bush*, 516 A.2d at 192.

[6] *Morris v. United States*, 548 A.2d 1383, 1387 (D.C. 1988); *see also Ingram v. United States*, 40 A.3d 887, 897 (D.C. 2012).

[7] *Williams v. United States*, 884 A.2d 587, 593-94 (D.C. 2005).

[8] *Sams*, 721 A.2d at 954 (quoting *Tillman v. United States*, 519 A.2d 166, 170 (D.C. 1986)); *see also Dancy v. United States*, 745 A.2d 259, 266 (D.C. 2000).

Brown's hospitalization due to multiple stab wounds. The evidence against Medley was not *de minimis* compared to the evidence against Richardson and McLeod. The government produced two eyewitnesses, Brown and Jones, to Medley's role in the 2009 attack, just as it did with respect to Richardson's, and presented post-incident consciousness-of-guilt evidence as to Medley (testimony about the numerous times Medley approached Jones or Brown after the 2009 assault) just as it did as to Richardson. The government would have been able to introduce such evidence even if Medley had been tried separately. Jurors were instructed not to consider Richardson's jail calls against Medley,[9] and the calls' probative value after redaction[10] was of such limited utility (except as to Richardson's state of mind) that we are satisfied Medley did not suffer manifest prejudice from the jury hearing them. Further, the very severity of the injuries that Medley allegedly inflicted on Brown — stab wounds that came close to the peritoneal cavity and that would have been life-threatening had they gone a little deeper — made Medley's defense-of-another claim suspect.

---

[9] The jury is "presumed to have followed" the court's instruction. *Catlett v. United States*, 545 A.2d 1202, 1212 (D.C. 1988).

[10] The trial court redacted Richardson's statements that he was "sitting here [in prison] taking the lick by [him]self . . . ." and that Medley was "dipping and dodging[,]" reasoning that those statements suggested Medley shared responsibility for the 2009 assault.

Medley also emphasizes that the trial court did not keep the evidence of the two assaults "separate and distinct." This is correct as a factual matter: Many of the government witnesses, including Brown, Jones, and Dr. Cooper (who treated Brown at the hospital after each assault), testified about both assaults; the prosecutor elicited testimony about the incidents by going back and forth between both assaults during the same examination; and the testimony was not presented in strict chronological order. In short, the presentation of evidence fluctuated back and forth between the two events in a manner we have previously found unacceptable in matters joined under Super. Ct. Crim. R. 8 (a).[11] Importantly, however, the "separate and distinct" standard does not govern our review of appellants' severance claims because joinder was pursuant to Rule 8 (b).

The requirement that properly joined offenses be tried in a "separate and distinct" manner was originally articulated in *United States v. Drew*. 331 F.2d 85, 91 (D.C. Cir. 1964). As the D.C. Circuit explained, when offenses alleged to have been committed at different times by a single defendant are joined for trial under Rule 8 (a), "the defendant may be prejudiced [because] . . . the jury *may cumulate*

---

[11] *See Bright v. United States*, 698 A.2d 450, 456-57 (D.C. 1997); *Long v. United States*, 687 A.2d 1331, 1339-40 (D.C. 1996); *Arnold v. United States*, 511 A.2d 399, 404-05 (D.C. 1986). Rule 8 (a) allows a prosecutor to try a single defendant for a multiple crimes allegedly committed at an assortment of times and places. *See Bailey v. United States*, 10 A.3d 637, 642-43 (D.C. 2010).

*the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find."* *Drew*, 331 F.2d at 88 (emphasis added). But, the *Drew* court reasoned, a defendant will not suffer prejudice from joinder when the evidence is presented in a "simple and distinct" manner, because a properly charged jury could "easily keep such evidence separate in their deliberations" and, therefore "[substantially reduce] the danger of . . . cumulating the evidence[.]" *Drew*, 331 F.2d at 91. This court has consistently applied this "simple and distinct" requirement, which has come to be known as the "separate and distinct" test,[12] in Rule 8 (a) cases (including the cases on which Medley relied on pages 31 and 32 of his brief). *See, e.g.*, *Bailey*, 10 A.3d at 643-44; *McFerguson v. United States*, 870 A.2d 1199, 1202-03 (D.C. 2005); *Taylor*, 603 A.2d at 456-57. We have not, however, required application of the "separate and distinct" test in resolving claims, such as appellants' claims here, that are based on joinder under Rule 8 (b).[13] Nor is it appropriate to do so, since Rule 8 (b)'s "same series of acts

---

[12] *See Long*, 687 A.2d at 1340 n.5.

[13] This is notwithstanding the reference in *Sanders v. United States*, 809 A.2d 584, 598 (D.C. 2002), to certain evidence having been kept separate and distinct in matters joined for trial under Rule 8 (b).

or transactions" criterion is antithetical to trying joined offenses in a "separate and distinct" manner.[14]

### 2. *Richardson's and McLeod's arguments*

Richardson argues that severance was required because of "unfair prejudice resulting from the brutal 2010 injuries," as to which only McLeod was charged. However, although Brown remained in the hospital longer (seven days) after the 2010 assault than he had after the 2009 attack, his injuries during the two assaults were similarly serious. During the 2009 assault, he suffered a stellate (or "starburst"-type) injury to the back of his head, a stab wound to his left, upper back, a stab wound to his left flank, and lacerations to his forehead and chin. Upon admission to the hospital after the 2010 assault, he was suffering from severe respiratory distress due to two punctured lungs and five stab wounds. He was given the same pain medication as was prescribed after the 2009 assault: Percocet, morphine, and Motrin.

---

[14] *See Davis*, 367 A.2d at 1261 ("The series of acts envisioned by the drafters of Rule 8 (b) is one in which the individual offenses are connected or interrelated in such a manner that proof of charges against one defendant would necessarily have to be introduced in proving the jointly-charged offenses . . . .").

Richardson also asserts that he was prejudiced by joinder because the jury heard what he argues were hearsay statements that McLeod made to Brown. We agree with the government that McLeod's statements, "I know you ain't going to court" and "I knew I would catch you by yourself[,]" were non-hearsay verbal acts or evidence of McLeod's state of mind. Richardson's suggestion that the jury might not have heard the statements had Richardson been tried separately overlooks the point that statements McLeod made in an effort to convince Brown not to testify still would have been admissible as consciousness-of-guilt evidence against Richardson (in conjunction with the jail calls in which Richardson called for McLeod to "talk to people").

McLeod acknowledges that "some evidence of the 2009 assault may have been admissible as background to the 2010 assault[.]" We are not persuaded by his vague argument that he nevertheless was unfairly prejudiced by joinder because much of the "duplicative" evidence about the 2009 assault would not have been admissible had he been tried separately. McLeod also argues that absent joinder, Richardson's "hearsay" statements in the jail calls could not have been introduced. However, for the reasons discussed *infra*, Richardson's statements in the redacted jail calls were not hearsay. Also, the statements would have been admissible

against McLeod in a separate trial to prove the close friendship between Richardson and McLeod.

### C. Admission of Richardson's Jail Calls

The trial court admitted Richardson's jail calls as substantive evidence against both Richardson and McLeod but instructed the jury not to use the calls against Medley.[15] Medley and McLeod now argue that Richardson's jail calls should not have been admitted at trial without first redacting their (nick)names from the recordings.

As we recognized in *Carpenter v. United States*, trial courts have a duty "to reduce or eliminate any prejudice arising from" the joint trial of defendants. *Carpenter*, 430 A.2d at 503. This duty includes "minimiz[ing] potential prejudice" to one defendant that would stem from the admission of his co-defendant's out-of-court statement if that statement would not have been admissible against the defendant in a separate trial. *Carpenter*, 430 A.2d at 505. Hence, in a joint trial, inculpatory statements admissible against a single defendant should be redacted so

---

[15] We note that, in closing argument, the prosecutor told the jury that the calls were "only admitted for Mr. Richardson's case."

as to remove incriminating references to a co-defendant "whenever such portions may be effectively deleted and the statement thus 'sanitized[.]'" *Carpenter*, 430 A.2d at 505. However, the requirements of *Carpenter* do not apply when the statement at issue "falls within an exception to the hearsay rule[.]" *Thomas v. United States*, 978 A.2d 1211, 1224 (D.C. 2009).

The *Carpenter* requirements do not apply here because none of the statements about which Medley and McLeod complain constituted hearsay, i.e., out-of-court statements "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2); *Jenkins v. United States*, 80 A.3d 978, 989 (D.C. 2013). None of Richardson's statements asserted that something happened or that a certain fact was true. The statements, which were relevant as evidence of Richardson's consciousness of guilt, were either assertions that something *ought* to occur or were directives or verbal acts introduced by the government in support of its theory that Richardson was seeking to have his friends silence Brown. *See Walker v. United States*, 982 A.2d 723, 737 (D.C. 2009) (quoting *Butler v. United States*, 481 A.2d 431, 438 n.10 (D.C. 1984)).

Even if we assume *arguendo* that Richardson's statements were hearsay, we are satisfied, as to both Medley and McLeod, that any prejudicial effect of the phone calls was minimal. Throughout the portions of the calls heard by the jury, Richardson referred to obtaining statements on behalf of his investigator. Although the prosecutor argued, outside the presence of the jury, that Richardson was using code to communicate a much more sinister message, the jury did not hear that interpretation, and, as discussed above, the most obviously prejudicial aspects of the phone calls were redacted, leaving the jury with little to hear but Richardson asking his friends to help the investigator. We also are satisfied that any prejudicial effect as to Medley was minimized still more by the court's limiting instruction that the calls were not to be used as evidence against him. As to McLeod, given the much more powerful and less ambiguous evidence the jury heard — Brown's testimony about McLeod's efforts to persuade him not to testify and about McLeod's vicious assault on him — we can say "with fair assurance" that the jury's "judgment was not substantially swayed" by admission of the calls. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

## D.  Sufficiency of Evidence for "Serious Bodily Injury"

Appellants Richardson and Medley argue that the government produced insufficient evidence for a reasonable jury to find that the injuries Brown suffered from the 2009 assault rose to the level of "serious bodily injury," which is an element of the crime of aggravated assault while armed (AAWA).[16] We disagree.

This Court has adopted the following definition of "serious bodily injury":

> bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty.

*Nixon v. United States*, 730 A.2d 145, 149 (D.C. 1999). We have clarified that "the 'substantial risk' of which *Nixon* speaks is only a substantial risk of death, not a substantial risk of extreme pain, disfigurement, or any of the other conditions listed." *Scott v. United States*, 954 A.2d 1037, 1046 (D.C. 2008).

---

[16] When analyzing the sufficiency of the evidence, we view the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987) (citations omitted). "[I]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Zanders v. United States*, 678 A.2d 556, 563 (D.C. 1996) (citations omitted).

The government relies on two elements from the definition of "serious bodily injury" to support its argument that the evidence was sufficient to prove serious bodily injury: extreme physical pain and unconsciousness. As to pain, we have said that victims need not describe their pain in a particular manner in order to meet the "extreme" standard, *Swinton v. United States*, 902 A.2d 772, 777 (D.C. 2006), and that jurors may "infer from the nature of [the victim's] injuries, and from [the victim's] reaction to them, that the pain was extreme." *Gathy v. United States*, 754 A.2d 912, 918 (D.C. 2000). Other factors that may be relevant to whether a reasonable juror could find that a particular injury caused "extreme physical pain" include (1) the need for and number of stitches the victim received; (2) the length of the victim's hospital stay; (3) the victim's behavior immediately after the assault; and (4) whether the victim received prescription pain medication.

Several of our previous cases are instructive. In *Jenkins v. United States*, the victim was attacked with a seven or eight inch knife, suffered multiple stab wounds in the stomach, chest, and arm, was bleeding profusely, required emergency exploratory surgery, remained in the hospital for five days, and received prescription pain medication. *Jenkins v. United States*, 877 A.2d 1062, 1071-72 (D.C. 2005). Hence, even though the victim was found leaning against a mailbox at the scene of the attack and never testified that he suffered "extreme" pain, his

injuries were sufficient for a reasonable jury to find that he suffered the "extreme physical pain" of a "serious bodily injury." *Id.* at 1071-72. In *Anderson v. United States*, the evidence sufficed to prove severe bodily injury because it showed that the victim was stabbed in her kidney, required immediate surgery that left a "six to eleven inch scar on [her] belly," suffered a broken nose and sinus bone, and received prescription pain medication. *Anderson v. United States*, 857 A.2d 451, 464-65 (D.C. 2004), We reached the same conclusion in *Hart v. United States*, where the victim suffered multiple stab wounds in her arm and vagina, required seventy-two stitches, spent four days in the hospital, and continued to feel pain from her injuries at the time of trial. *Hart v. United States*, 863 A.2d 866, 875 (D.C. 2004). And in *Baker v. United States*, the victim was stabbed five or six times, including three times in the head; remained in the hospital for five days; received 40 staples in his arm and 35-40 staples in his stomach; and suffered severe blood loss. *Baker v. United States*, 867 A.2d 988, 995, 1009 (D.C. 2005). Again, these injuries were sufficient for a reasonable jury to find that the victim suffered "extreme physical pain," even though he did not testify about the extent of his pain at trial. *Id.* at 1009 n.26.

Here, the jury heard evidence that during the November 2009 incident, Brown suffered a stellate or starburst-type injury to the back of his head, a stab

wound to his left, upper back, a stab wound to his left flank, and lacerations to his forehead and chin. He received 18 staples to close the wound to his head, and his other injuries were also treated with sutures and staples. According to Dr. Cooper, Brown's injuries were "very painful," and the "only reason [Dr. Cooper] admitted him to the hospital was to control his pain, as well as to make sure that none of the injuries that he had evolved into other things." Brown remained in the hospital from the night of November 10 until November 12 and received morphine, Percocet, and Motrin for his pain. Brown described the pain as "terrible," as if someone had "split [his head] open." Unlike the situation of the victims in *Bolanos v. United States*, there is no indication that Brown was able to walk away from the scene on his own. *Bolanos v. United States*, 938 A.2d 672, 681-82 (D.C. 2007). Months after the 2009 assault, Brown was "still hurting" from the attack and in need of pain medication. And, at the time of trial, he testified that he still suffered from headaches and pain from the stab wound to his flank.

Considering the foregoing evidence of Brown's pain, we cannot say, as a matter of law, that the evidence was insufficient to prove that he suffered "serious bodily injury" within the meaning of the aggravated assault statute.[17] This is

---

[17] Given the foregoing conclusion, we need not discuss the government's argument that the evidence of unconsciousness in this case sufficed to establish
(continued…)

especially so in light of the additional evidence that Brown suffered some "protracted . . . impairment of the function" of bodily members. *Nixon*, 730 A.2d at 149. The officer who arrived at the scene of the assault found Brown to be "confused, dazed . . . [and] unsteady," and, at the time of the 2010 attack nearly a year later, Brown was still using a cane due to dizziness. He also testified that he could not sit too long because, if he did, the wound to his side would cause him to cramp, and he would be unable to "move [his] leg right."

### E. Evidence of the Earlier Assault on "Black"

Appellant Richardson argues that the trial court erroneously admitted evidence of a prior bad act when it allowed Jeanetta Smith to testify that he assaulted a man known as "Black." Specifically, Smith testified that she admitted to Richardson that Black had provided her with cocaine and that, after hearing this

---

(…continued)
serious bodily injury or Medley's argument that the evidence of unconsciousness was speculative. We note, however, that while Brown's testimony that he fell unconscious after the 2009 assault was contradicted at least in part by the testimony from Officer Smith, Detective Herndon, and Dr. Cooper, each of whom reported he spoke with Brown at a time when Brown claimed to have been unconscious, the testimony of those witnesses did not cover the entire timespan between the assault and Brown's treatment at the hospital. The jury was also not required to conclude that Brown's inability to remember some of what happened after the 2009 assault was attributable to memory problems from his head injury rather than to a period(s) of unconsciousness.

news, Richardson physically assaulted Black. The government offered this evidence to show Richardson's motive for attacking Brown — outrage at someone he understood to have supplied drugs to Smith — thus countering Richardson's contention that he acted against Brown in self-defense.

While evidence of prior criminal conduct is not admissible to prove that a defendant has the propensity to engage in criminal behavior, *Drew*, 331 F.2d at 89-90, evidence of prior bad acts may be admissible for other purposes, such as to prove motive. *Johnson v. United States*, 683 A.2d 1087, 1092 (D.C. 1996) (citing *Drew*, 331 F.2d at 90). Even if evidence of a prior bad act falls into an exception, however, before admitting it the trial court must find, *inter alia*, that the evidence is relevant to "a genuine and material issue" in the case;[18] that the prosecution has established, by clear and convincing evidence, that the prior bad act did occur;[19] and that the prejudicial effect of the evidence does not substantially outweigh its

---

[18] *Thompson v. United States*, 546 A.2d 414, 420, 423 (D.C. 1988) ("We . . . hold that where intent is not controverted in any meaningful sense, evidence of other crimes to prove intent is so prejudicial *per se* that it is inadmissible as a matter of law."); *Campbell v. United States*, 450 A.2d 428, 430 (D.C. 1982).

[19] *Johnson*, 683 A.2d at 1093.

probative value.[20]  "Regarding the last factor, the appropriate balancing test is whether the prejudicial impact of the evidence 'substantially' outweighs its probative value." *Bacchus,* 970 A.2d at 273 (citation omitted).  We review a trial court's admission of evidence, including its decision on whether evidence is more prejudicial than probative, for abuse of discretion.  *Jackson v. United States*, 856 A.2d 1111, 1117 (D.C. 2004).

Here, Richardson's defense was that he acted in self-defense.  By doing so, he put his own state of mind at issue, causing the government to have to prove that Richardson was *not* motivated by a reasonable belief that he needed to protect himself.  *Garibay v. United States*, 634 A.2d 946, 948 (D.C. 1993) ("[A] self-defense claim raises the issue of whether the defendant was acting out of an actual and reasonable fear of imminent bodily harm, or whether, instead, the defendant had some other motive and was, in fact, the aggressor.").  The issue of Richardson's motive was, therefore, a genuine and material issue before the jury.

In determining whether the government provided clear and convincing evidence that Richardson assaulted Black, the trial court was permitted to base its

---

[20] *Bacchus v. United States,* 970 A.2d 269, 273 (D.C. 2009); *Thompson*, 546 A.2d at 420.

ruling on a "detailed proffer from the government." *Daniels v. United States*, 613 A.2d 342, 347 (D.C. 1992) (quoting *Groves v. United States*, 564 A.2d 372, 375 (D.C. 1989)). In this case, the trial court did not explicitly find that the government had proffered clear and convincing evidence of Richardson's involvement in the earlier assault, despite a request by Richardson's counsel for such a finding. As we stated in *Lewis v. United States*, where "the trial court and counsel engaged in several extensive colloquies regarding the *Drew* issue" without the trial court ever making an express finding as to the sufficiency of the government's evidence, "the failure of the trial court to make all the necessary inquiries in exercising its discretion constitutes error." *Lewis v. United States*, 567 A.2d 1326, 1330 (D.C. 1989). Accordingly, we review the trial court's failure explicitly to make the requisite finding for harmless error. *White v. United States*, 613 A.2d 869, 874 (D.C. 1992). We conclude that the error was harmless, because the government's proffer was clearly adequate. The government proffered that Smith had testified before the grand jury that (1) shortly before the 2009 assault on Brown, she told Richardson that Black had provided her with a cocaine-laced marijuana cigarette; (2) she named Brown as another individual who was with her when she smoked the drugs or was supplied the drugs; (3) Richardson became very angry when she told him these things; and (4) she shortly thereafter witnessed Richardson "beat up" Black. Although defense counsel proffered that Black

himself disagreed with Smith's characterization of his fight with Richardson, "[t]his court has held that an eyewitness' testimony of h[er] observations of the prior bad acts meets the required standard of showing by clear and convincing evidence that the defendant was connected with the prior unlawful conduct for purposes of admission of evidence under a *Drew* exception." *Frye v. United States*, 926 A.2d 1085, 1094 (D.C. 2005).

We next must determine whether evidence of Richardson's earlier assault on Black was probative of Richardson's motive to attack Brown in a way that "did not depend 'wholly or primarily on the jury inferring' that appellant 'was predisposed or had a propensity to commit the charged crimes.'" *Legette v. United States*, 69 A.3d 373, 384 (D.C. 2013) (quoting *Harrison v. United States*, 30 A.3d 169, 178 (D.C. 2011). We have recognized on numerous occasions that previous assaults against the *same victim* can serve as motive evidence, demonstrating the appellant's incentive to attack the victim yet again. *See, e.g.*, *Garibay*, 634 A.2d at 948-49; *Hill v. United States*, 600 A.2d 58, 62 (D.C. 1991). By contrast, we have recognized that when successive victims are involved, evidence of motive can "verge[] upon inadmissibility as mere propensity evidence." *Harrison v. United States*, 30 A.3d at 178 (quoting *Robinson v. United States*, 623 A.2d 1234, 1239 (D.C.1993)) (internal quotation marks omitted) (holding that evidence that a school

teacher had made inappropriate, sexual remarks to teenage girls was inadmissible propensity evidence when he was on trial for sexually assaulting a different teenager). Here, however, we are satisfied that the motive evidence was not evidence suggesting that appellant had a general propensity to commit assaults; rather, it was evidence suggesting that, if the information appellant received about Black and Brown supplying cocaine to Smith led Richardson to be angry at both men and to attack Black, that information and anger — and not self-defense, as Richardson claimed — were what led Richardson to attack Brown not long after attacking Black. We therefore agree with the trial court that evidence of Richardson's earlier assault on Black was not mere propensity evidence, elicited to show Richardson's violent nature. Rather, it was probative of Richardson's narrow, specific motive to single out Brown and physically harm him.

We are also satisfied that the evidence of Richardson's earlier assault on Black was not substantially more prejudicial than probative. *Bacchus*, 970 A.2d at 273. The evidence was highly probative, demonstrating not only the depth of Richardson's anger but aiding the jury in weighing whether the government had carried its burden of proof against Richardson's contention that he acted in self-defense. At the same time, the prejudicial effect, while certainly present, was minimal. Few specifics about the attack on Black were provided, and the jury was

not even told whether Black sustained any injuries, learning only that Richardson "[b]asically" got the better of Black and "put him out of the house."

**F.  The Initial Encounter Between Brown and Richardson as Part of the Charged Conduct**

As described above, Brown testified that the November 10, 2009 incident occurred in two separate locations.  Brown testified that, during what Richardson refers to as the "first encounter," Richardson confronted Brown about providing cocaine to Smith and then struck Brown on the head with a pole.  After Brown escaped around a corner, Richardson followed, and, in what Richardson refers to as the "second encounter," the two men approached each other, the two began grappling, Medley appeared on the scene behind Brown, and Brown was stabbed.  Richardson argues that since the indictment charged both Richardson and Medley with committing an aggravated assault on Brown and since there was no evidence that Medley was involved in the "first encounter," the "first encounter" could not have been part of the charged conduct.  He argues that the trial court therefore erred in refusing to instruct the jury that "the charges in this case are based only on the second encounter."

We reject Richardson's argument. An assault can (and often does) consist of a series of related events. *See, e.g.*, *Glymph v. United States*, 490 A.2d 1157, 1159-61 (D.C. 1985) (concluding that where the appellant, although twice interrupted by phone calls, engaged in an hour-long assault of his ex-girlfriend, the beatings were properly joined under a single count as a "continuing course of assaultive conduct"). The government's theory, which it sought to prove through Brown's testimony, was that the "first encounter" and "second encounter" were part of the same, continuing course of assaultive conduct, in which Medley joined when Richardson and Brown moved around the corner. Of course, the jury was not required to accept that theory and could have instead accepted the defense theory of the case — which the trial court read to the jury **[9/6: 152-53]** — that what occurred initially was a mere verbal altercation between Richardson and Brown and that Brown was the eventual aggressor against Richardson. But we discern no error in the trial court's refusal to instruct the jury that "[t]here are no charges associated with the second encounter."

## G. Refusal to Give a Missing Evidence Instruction

After the 2009 assault, the police took pictures of the crime scene. These pictures depict pieces of a broken chair, a red-stained seat cushion, and a broken

railing, but the crime scene search officer gathered only one leg from the broken chair and Brown's bloody clothing. No tests were run on these objects, and thus neither fingerprints nor DNA evidence was recovered from the scene. Richardson contends that the failure to recover or test all of the physical evidence at the scene of the assault caused the defense to lose "potentially compelling exculpatory evidence." He argues that the trial court erroneously refused to give a missing-evidence instruction to the jury.

We have recognized that a missing evidence instruction allows the jury to infer from the absence of evidence that, if the evidence had been produced, it would have been unfavorable to the party who could have produced it yet did not. *Dent v. United States*, 404 A.2d 165, 170 (D.C. 1979). There is therefore a strong risk that the trial court giving the instruction will "in effect create[] evidence from nonevidence, [and] may add a fictitious weight to one side of the case . . . ." *Evans v. United States*, 12 A.3d 1, 12 (D.C. 2011) (quoting *Dent*, 404 A.2d at 170-71). Hence, we accord the trial court "considerable discretion" in determining whether a missing evidence instruction should be given. *Tyer v. United States*, 912 A.2d 1150, 1164 (D.C. 2006). The burden is on the party seeking the instruction to show that the evidence (1) was "likely to elucidate the transaction at issue" and (2) was "peculiarly available to the party against whom the adverse inference is sought

to be drawn." *Tyer*, 912 A.2d at 1164 (quoting *Hinnant v. United States*, 520 A.2d 292, 294 (D.C. 1987)).

Here, we discern no erroneous exercise of discretion in the trial court's refusal to give the instruction because Richardson did not meet the requirements of the first prong of this analysis. It is by no means clear that the missing objects were "likely to elucidate" whether Richardson acted in self-defense — which was the actual question before the jury, as Richardson at no point denied that he was both at the scene and involved in a physical altercation with Brown. *Cf. Tyer*, 912 A.2d at 1165-66.[21] Therefore, even if we analyze the issue as whether the trial court erroneously exercised its discretion when it declined to give the requested instruction as a sanction against the government for failure to preserve crime-scene evidence, we would hold that Richardson is not entitled to relief because the alleged error "did not substantially prejudice appellant or significantly contribute to the verdict rendered against him." *Simmons v. United States*, 999 A.2d 898, 901 (D.C. 2010) (quoting *Cotton v. United States*, 388 A.2d 865, 871 (D.C. 1978)).

---

[21] Even if the instruction had been warranted, we are persuaded that any error in failing to give it was harmless. *See Tyer*, 912 A.2d at 1164. Defense counsel argued in closing that reasonable doubt existed because the government failed to preserve crucial items at the crime scene and engaged in an able cross-examination of the crime scene search officer on this topic.

**H.  Richardson's Fine Payment Schedule**

Richardson's final argument is that the trial court improperly delegated to the Bureau of Prison's Inmate Financial Responsibilities Program the court's authority to establish the timing of the payment he was ordered to make to the Victims of Violent Crime Compensation Fund.  The authorities Richardson cites for his argument are inapposite, as all pertain to delegation by federal district courts and are inapplicable as to the District of Columbia Superior Court.

**I.  Merger of Certain Convictions**

Appellant Medley argues that his convictions for ADW and ASBI merge with his AAWA conviction, and appellant McLeod argues that his conviction for ASBI merges with his conviction for AAWA.  They are correct.  "ADW is a lesser included offense of aggravated assault while armed."  *Gathy*, 754 A.2d at 919.  Additionally, "ASBI is a lesser-included offense of aggravated assault."  *Collins v. United States*, 73 A.3d 974, 985 (D.C. 2013).  Richardson does not argue that his convictions for ADW and ASBI merge with his conviction for AAWA, but we conclude for the foregoing reasons that they do merge.  *See Carter v. United*

*States*, 957 A.2d 9, 22 (D.C. 2008) (raising merger issue *sua sponte* as to co-appellant). Therefore, we remand to the trial court to vacate (1) Medley's and Richardson's convictions for ADW and ASBI and (2) McLeod's conviction for ASBI. No resentencing is required. *See Collins*, 73 A.3d at 985 ("Resentencing is not required, as appellant's sentences for these counts are concurrent and congruent.").

## III. Conclusion

We remand for the trial court to vacate the lesser-included convictions that are affected by merger. In all other respects, the judgments of the trial court are

*Affirmed.*