*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-2022

DONELL R. WASHINGTON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-13430-10)

(Hon. Russell F. Canan, Trial Judge)

(Argued November 6, 2014　　　　　　　　　　Decided March 5, 2015)

*Daniel Gonen*, Public Defender Service, with whom *James Klein*, Public Defender Service, was on the brief, for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Glenn L. Kirschner*, *Kathryn L. Rakoczy*, and *John Giovannelli*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BLACKBURNE-RIGSBY, *Associate Judges*, and NEBEKER, *Senior Judge*.

NEBEKER, *Senior Judge*:  Appellant Donell R. Washington appeals his convictions at a jury trial of first-degree murder while armed[1] and related offenses.[2]  On appeal, he contends that the trial court abused its discretion in two respects:  (1) by refusing to issue a missing evidence instruction following the government's loss of DNA swabs prior to trial; and (2) delivering a concurrent intent jury instruction with respect to the AWIKWA charges.  Having concluded that the DNA swabs lost by the government amounted to no more than potential evidence and that the trial court did not err in issuing a concurrent intent jury instruction, we affirm appellant's convictions.

## I.

The victim, Stanley Dawson, was killed during the late night hours of July 8, 2010.  He was gunned down at a neighborhood playground in the Southeast quadrant of the District of Columbia.  Evidence at trial showed that appellant

---

[1]  *See* D.C. Code §§ 22-2101, -4502 (2001 ed.).

[2]  Appellant was also convicted of three counts of assault with intent to kill while armed ("AWIKWA"), in violation of D.C. Code §§ 22-401, -4502 (2001 ed.); one count of carrying a pistol without a license, in violation of § 22-4504 (b); and four counts of possession of a firearm during a crime of violence, in violation of § 23-1328 (a)(1).

approached Dawson, who was standing with three other individuals on the playground, and fired off as many as ten .40-caliber rounds at the group. Dawson was killed, and two others suffered gunshot wounds.

Testimony elicited at trial suggested that the shooting arose from a confrontation between Dawson, appellant, and Marcus Snell—appellant's close friend—on July 4, 2010. On that date, neighborhood residents and families were outside celebrating the holiday when Snell, holding a handgun he acquired from appellant, fired four or five rounds into the air. Dawson immediately approached appellant and Snell, admonished Snell for firing a gun when there were children around, and took possession of the firearm.

On the night of July 8, Dawson was at a neighborhood playground with friends Kawan McCoy and Eric Henderson. Two more of Dawson's friends, Antonio Carroll and James Scott ("L.J."), parked their car near the playground and joined the group, now five strong. Carroll left to purchase cigarettes from Henderson's father in a nearby building; he was not present at the playground when the shooting occurred. McCoy then left the playground to purchase a cigarette and some food from Henderson's father, but returned from the excursion prior to the shooting. McCoy testified that as he was standing next to Dawson, a

man turned on to the footpath that ran past the playground that Dawson, McCoy, and the others were occupying. McCoy then observed the man, later identified as appellant, step "into the [street] light," and saw that the shooter was wearing a black bandana tied around the lower half of his face.[3] Appellant then began shooting at Dawson, firing off "more than five" rounds.[4]

After the shots were fired, "everybody ran" from the playground. Scott's left foot was struck by a bullet, and one bullet grazed his nose. Henderson was shot in his left forearm and buttocks. Dawson was struck in his face and upper back, and was discovered a short distance from the playground by an off-duty Metropolitan Police Department (MPD) officer working neighborhood security. Dawson died after being transported to a local hospital.

---

[3] Scott, who was present at the playground, did not remember the shooter wearing anything covering his face, but identified appellant as the shooter. Carroll, who was not at the playground when the shooting took place, identified appellant as the shooter, and testified that appellant was wearing black clothing with a red bandana over his mouth. Carroll was able to see the shooter when he followed Henderson's father ("Pops") out of the building the two were in. Carroll looked out and saw someone shooting toward the playground where Dawson was standing. Carroll testified that he was about ten to twelve feet away from appellant when the shooting took place.

[4] McCoy testified that he remembered "more than five" shots being fired. Scott testified that he remembered hearing approximately eleven gunshots. The police recovered ten .40-caliber bullet casings from the crime scene, all of which had been fired from the same firearm.

Andrea Williams lived in a single-family home located one street over from the playground where the shooting occurred. Williams testified that immediately after the shots stopped, she went to her window and saw a black male—approximately six feet tall, with a thin build, and wearing all black clothing—running across the street, but not from the direction of the playground. As the man approached her house, Williams moved to a back window in her home and observed the unidentified man attempt to scale the fence attached to her house by putting "his hands on [it]." Williams was not able to see the man's face, did not observe the man carrying a weapon, and could not see whether the man was wearing any kind of red bandana or mask.

### (A) The Loss of the DNA Swabs and the Requested Missing Evidence Instruction

Andrea Williams was interviewed by police during the investigation of the shooting, and an evidence technician was dispatched to "swab" the fence for biological materials or DNA. The technician observed a broken fence board which contained what "looked like a footprint" and an area where "some fingernails had actually grabbed the top of the fence," but saw no blood or other visible DNA evidence. The technician swabbed the top of the fence where it looked like fingernails made an impression in the wood.

The DNA swabs were transferred to William Hyatt, the lead evidence technician for the investigation of the shooting. Hyatt transported the swabs along with other evidence from the scene to the MPD Evidence Operations Center (EOC), a secure evidence processing facility. The swabs were placed on a transportation cart, wheeled into a room within the EOC, and left there unattended, in violation of MPD protocol, as Hyatt failed to secure a receipt for the item.[5] Prior to testing, the swabs went missing. Hyatt testified that he had no knowledge of their whereabouts, and did not misplace the swabs intentionally. A "comprehensive search" for the missing item proved fruitless.

The aforementioned loss of the swabs led appellant to seek dismissal of the indictment. The trial court denied the motion. As a contingency, appellant requested a missing evidence instruction, which the trial court also denied.

The requested instruction would have told the jury that it was allowed to infer that the missing evidence would have been unfavorable to the government. Although the missing swabs were "relevant" and "uniquely available to the government," the trial court found that their "relevance [was] minimized

---

[5] MPD policy regarding confirmation of receipt of evidence is designed to record the exact time of receipt by the EOC and to track chain of custody whenever evidence cannot be located.

significantly" and that the swabs were not "particularly probative." Examining the totality of the circumstances, the individual who jumped over the fence could have been the shooter, but also could have been someone fleeing from gunfire. Moreover, the swabs "could very well have been more inculpatory rather than exculpatory." And although the government was in possession of the swabs and lost them, there was no deliberate attempt to hide the item; "at best there was some negligence somewhere along the line." Under these circumstances, there was an "overriding danger" that the court would be lending its stamp of approval to an unreasonable inference. While the trial court refused to issue the instruction as a sanction, it suggested appellant could argue, as he had a right to do, lack of corroboration on the government's part for failure to preserve tangible evidence.

### (B) The Concurrent Intent Jury Instruction

The government charged appellant with three counts of AWIKWA, one count for each individual standing with Dawson at the playground when he was shot and killed. In prosecuting the AWIKWA charges, the government sought a jury instruction on the issue of concurrent intent, and after the trial court found the instruction to be appropriate, it issued the following language to the jury:

I have already instructed you on the offenses, on the assault with intent to kill while armed and assault with a dangerous weapon. I further instruct you that [if] the government prove[d] beyond a reasonable doubt that Mr. Washington fired multiple shots creating a zone of harm or danger around a number of people, such as the complaining witnesses in this case, with the intent to kill, injure or harm[,] [y]ou may infer that the defendant intended to kill, injure or harm any other person in the anticipated zone of harm or danger and that the defendant has committed the same degree of assault with intent to kill against the other named persons as he committed against the named target, which in this case would have been Mr. Dawson. The principle applies to whether or not the intended victim was also killed, injured or harmed and whether or not the intended victim is identified.

On the second day of deliberations, the jury sought clarification on the instruction. Specifically, the jury inquired as to what it meant that the jury "may infer that the [appellant] intended to kill/kill/injure/harm any other person in the zone of harm/danger." The next morning, the trial court issued the following clarification:

By "may" infer, the instruction means that you may conclude, but are not required to conclude, that the defendant intended to kill others in the zone of danger. For example, the defendant is charged with assaulting complaining witnesses – a complaining witness or witnesses with intent to kill that complaining witness.

If you find that the defendant fired multiple shots at Stanley Dawson and in so doing created a zone of danger around Stanley Dawson with intent to kill, injure, or harm him, and you find that a complaining witness was inside that zone of danger, you may conclude, but are not

required to conclude, that defendant also intended to kill, injure, or harm the complaining witness.

Later that morning, the jury reached its verdict and convicted appellant on all counts, except for one count of carrying a firearm without a license.

## II.

Turning to the merits, we first address appellant's argument that the trial court abused its discretion when it denied his request for a missing evidence jury instruction as a sanction for the government's loss of the DNA swabs.

We review the trial court's exercise of this discretion for abuse. *Evans v. United States*, 12 A.3d 1, 12 (D.C. 2011); *Tyer v. United States*, 912 A.2d 1150, 1164 (D.C. 2006) (citation omitted). It is well-settled that the government has a duty to preserve discoverable evidence under Super. Ct. Crim. R. 16 (a)(1)(c). *Myers v. United States*, 15 A.3d 688, 690 (D.C. 2011). That duty has been violated when evidence is lost due to "negligence or purposeful destruction accompanied by either bad motive or bad judgment." *Robinson v. United States*, 825 A.2d 318, 331 (D.C. 2003) (quoting *Bartley v. United States*, 530 A.2d 692, 697 (D.C. 1987)). To remedy past transgressions and deter future violations, the trial court is empowered

to fashion an appropriate sanction in response to a violation. *Cotton v. United States*, 388 A.2d 865, 869 (D.C. 1978).

We have held a number of times that discovery violations resulting from the negligent loss of evidence do not "automatically require the imposition of sanctions." *Robinson*, *supra*, 825 A.2d at 331 (quoting *McGriff v. United States*, 705 A.2d 282, 287 (D.C. 1997)); *see also United States v. Augenblick*, 393 U.S. 348 (1969) (noting that when violations of the Jencks Act occur, the imposition of sanctions is left to the trial court's discretion). The "choice of [which] sanction," or "whether to impose any sanction at all" is within the trial court's discretion, with the "only real limitation being that a sanction must be just under the circumstances." *Id.* (quoting *Davis v. United States*, 623 A.2d 601, 605 (D.C. 1993)).

Even when the party seeking the missing evidence instruction is able to carry its initial burden, *Medley v. United States*, 104 A.3d 115, 147-48 (D.C. 2014), the trial court retains discretion to refuse issuing a missing evidence instruction. *Thomas v. United States*, 447 A.2d 52, 58 (D.C. 1982) (citing *Simmons v. United States*, 444 A.2d 962, 964 (D.C. 1982) (other citations omitted)). We have characterized this discretion as "considerable." *Medley*,

*supra*, 104 A.3d at 147; *Evans*, *supra*, 12 A.3d at 12; *Tyer*, *supra*, 912 A.2d at 1166 (quoting *Simmons*, *supra*, 444 A.2d at 964) (recognizing that the trial court retains "considerable latitude to refuse" giving the instruction when the result "is not a natural or reasonable one").

The ample discretion afforded to the trial court in this area is grounded in the recognition that a missing evidence instruction carries with it several inherent dangers, the principal danger being that the instruction "represents a radical departure from the principle that the jury should decide the case by evaluating the evidence before it." *Evans*, *supra*, 12 A.3d at 12 (quoting *Tyer*, *supra*, 912 A.2d at 1164). Moreover, the instruction effectively "creates evidence from non[-]evidence," adding "a fictitious weight to one side of the case . . . ." *Id.* (quoting *Dent*, *supra*, 404 A.2d at 170-71). Finally, the inference that accompanies the instruction is typically "argued in summation when an evidentiary explanation for the absence of the [evidence] no longer can be presented to the jury." *Id.* (alteration in original) (citation omitted). It is for these reasons that we have "underscored the discretion which the trial judge retains to deny the instruction even when its prerequisites have been met." *Battochi v. Washington Hosp. Ctr.*, 581 A.2d 759, 766-67 (D.C. 1990) (discussing the trial court's discretion in criminal cases).

Having reviewed the record, we conclude that the trial court did not abuse its discretion. It is entirely unclear whose DNA the swabs contain—if they contain any DNA at all—and it would require substantial speculation on the part of the trial court to bridge the gap from potential evidence to an adverse inference against the government. The missing swabs contained potential evidence. There were at least five people—including the shooter—who could have fled the scene and attempted to climb over Ms. Williams' fence. This number does not take into account any unaffiliated parties in the area who simply fled when as many as ten rounds were fired. No one could identify the individual who climbed over the fence, and testimony elicited painted this person as having some characteristics of the shooter (all black clothing) while lacking other characteristics (no weapon and no recognition of a bandana or mask on the person).

Furthermore, there is no guarantee that DNA was preserved on the fence in question—a fence that had been in place for five years—or that it came from an individual fleeing the scene of a shooting rather than someone else's skin contact at a prior point in time. Succinctly, the record establishes that an unknown person climbed a fence, may have left testable DNA, and there is absolutely no indication as to who this person is, or whether any potential evidence would be inculpatory or exculpatory. It is for these reasons that the trial court's refusal of the instruction

did not constitute an abuse of the "considerable discretion" afforded to the trial court. *Evans*, *supra*, 12 A.3d at 12 (quoting *Tyer*, *supra*, 912 A.2d at 1164). The trial court evaluated "all [the] circumstances" surrounding the missing swabs, and found that an adverse inference would not be a natural and reasonable one. Thus, if it issued an instruction permitting an adverse inference, "the court would be giving its imprimatur on a fictitious weight of evidence." Accordingly, the trial court's exercise of discretion falls within the "considerable latitude" it is afforded on such matters, and no abuse occurred. *Tyer*, *supra*, 912 A.2d at 1165.

Moreover, we conclude that even if the instruction had been warranted, the error in refusing to issue it was harmless. Defense counsel argued during closing remarks that reasonable doubt existed, in part, because the government failed to preserve the DNA swabs. Defense counsel was also able to engage in cross-examination of both the evidence technician who swabbed the fence, and the lead evidence technician who was entrusted with delivering the swabs to the EOC, who was the last person in possession of the swabs and who violated MPD policy by failing to obtain an evidence receipt. And defense counsel called Andrea Williams and questioned her on the individual who scaled her fence on the night of the shooting. *Medley*, *supra*, 104 A.3d at 148 n.21; *Tyer*, *supra*, 912 A.2d at 1164. Thus, any error germinating from a failure to issue the instruction was not one that

"substantially swayed" the jury's judgment. *Medley*, *supra*, 104 A.3d at 133 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

**III.**

Appellant's remaining contention is that the trial court abused its discretion when it issued a concurrent intent jury instruction relating to the three charges of AWIKWA brought against appellant. Specifically, appellant argues both that the concurrent intent instruction was an inadequate statement of law, and that the trial court failed to appropriately clarify the instruction in the face of articulable jury confusion.

"It is clear that a party is entitled to a jury instruction upon the theory of the case if there is sufficient evidence to support it." *Pannu v. Jacobson*, 909 A.2d 178, 192 (D.C. 2006) (quoting *George Washington Univ. v. Waas*, 648 A.2d 178, 183 (D.C. 1994)). We review "the trial court's decision to give a requested jury instruction for abuse of discretion, viewing the instructions as a whole," *id.*, and view "the record in the light most favorable to that party." *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C. 1997). "[T]he central question for this court is whether [the instruction] is an adequate statement of the law, and whether it is supported by

evidence in the case." *Wheeler v. United States*, 930 A.2d 232, 238 (D.C. 2007);

*see also Pannu*, *supra*, 909 A.2d at 192 (quoting *Nelson*, *supra*, 694 A.2d at 901)

(noting that the "trial court has broad discretion in fashioning appropriate jury

instructions").

To obtain a conviction for AWIKWA, the government must prove beyond a

reasonable doubt that the defendant (1) assaulted the victim, (2) with the specific

intent to kill, (3) while armed. *Hagans v. United States*, 96 A.3d 1, 42 n.131 (D.C.

2014) (quoting *Nixon v. United States*, 730 A.2d 145, 148 (D.C. 1999)). Similarly,

murder in the first degree requires a "specific intent to kill." *Walden v. United

States*, 19 A.3d 346, 349 n.4 (D.C. 2011). This jurisdiction has adopted the theory

of concurrent intent;[6] "where the means employed to commit the crime against a

primary victim created a zone of harm around that victim, the fact[-]finder can

reasonably infer that the defendant intended that harm to all who are in the

anticipated zone." *Nixon*, *supra*, 730 A.2d at 149 (quoting *Ruffin v. United States*,

642 A.2d 1288, 1298 (D.C. 1994)).

When the trial court clarified the concurrent intent instruction it had issued

the prior afternoon, it informed the jury that if the government had proved beyond

[6] Criminal Jury Instructions for the District of Columbia, No. 3.201 (5th ed. rev. 2014)

a reasonable doubt that appellant had fired multiple shots at Stanley Dawson with the intent to kill him, and in doing so created a zone of harm or danger, and a complaining witness was located within said zone, then the jury may, but is not required to, conclude that appellant possessed the specific intent to kill the complaining witness. We have held that "[u]nder the concurrent intent doctrine, a specific intent to kill each individual may be imputed to a defendant who fires multiple shots at two or more persons at close range." *Walls v. United States*, 773 A.2d 424, 434 (D.C. 2001); *see also Di Giovanni v. United States*, 810 A.2d 887, 894-95 (D.C. 2002) (by pointing the gun and firing in the direction of the victim, although intending to shoot two other men, "[r]easonable jurors could find beyond a reasonable doubt" that the defendant was guilty of AWIKWA because he had placed the victim "in a zone of harm"); *Ruffin*, *supra*, 642 A.2d at 1298 (when defendant unleashed a "hail of gunfire" wounding the victim, and another person was in the "direct line of fire" and killed, the evidence "permitted finding concurrent intent to kill everyone in the path of the bullets").

Evidence at trial showed that appellant fired as many as ten shots at four people standing in close proximity to one another. Scott was sitting on a set of steps while Dawson and McCoy were standing "near him." McCoy was standing next to Dawson, close enough to have "tapped" him on the shoulder. Appellant

was standing approximately twenty-one feet away from Dawson and the others. Dawson, Henderson, and Scott were all struck by bullets fired by appellant. It is not disputed that Dawson was the sole target of the shooting. And the police recovered ten .40-caliber bullet casings from the scene of the shooting, all of which had been fired from the same firearm. Therefore, we conclude both that the jury instruction was an adequate statement of the law and was supported by evidence in the record. *Wheeler*, *supra*, 930 A.2d at 238.

As a final matter, we are not persuaded by appellant's argument that the trial court failed to remedy the jury's confusion on the concurrent intent instruction. The jury asked what the following portion of the instruction meant: that the jury "may infer that the defendant intended to kill/injure/harm . . ." and that "[e]xamples would be helpful." "The decision on what further instructions to issue to the jury lies within the sound discretion of the trial court," and we review for abuse. *Gray v. United States*, 79 A.3d 326, 337 (D.C. 2013) (quoting *Yelverton v. United States*, 904 A.2d 383, 387 (D.C. 2006)). In response to specific difficulties encountered by the jury, the trial court must "clear them away with concrete accuracy." *Id.* (quoting *Alcindore v. United States*, 818 A.2d 152, 155 (D.C. 2003)).

The trial court clarified that if the defendant fired multiple shots with the intent to kill, injure, or harm Stanley Dawson, and in doing so created a zone of danger, and a complaining witness was located within that zone of danger, then the jury "may conclude but [is] not required to conclude that the defendant also intended to kill, injure, or harm the complaining witness." The trial court did not simply "rely on more general statements in its prior charge," and did not tell jurors "to refer back to their original charge." *Gray*, *supra*, 79 A.3d at 337 (citation omitted). On its face, the clarification appeared to be "fairly balanced" and did not "single out one aspect of the case." *Yelverton*, *supra*, 904 A.2d at 389. And the jury did not express continuing confusion after the clarification was issued. Accordingly, we conclude that the trial court did not abuse its discretion.

*****

For the aforementioned reasons, we affirm appellant's convictions. Accordingly, the judgment is

*Affirmed.*